**Michael S. Riley**
**(Admitted Pro Hac Vice)**
242 Algiers Avenue
Fort Lauderdale, Florida 33308
Tel: (954) 401-3757
Email: mriley8@aol.com

FILED

APR - 3 2013

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

Special Counsel for Allana Baroni
Chapter 11 Debtor and Debtor In Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ALLANA BARONI<br><br>      Debtor and Debtor in Possession | Case No.: 1:12-BK-10986-AA<br><br>Chapter 11<br><br>Adv. No.: _____ |
| ALLANA BARONI,<br><br>      Plaintiff,<br><br>v.<br><br>NATIONSTAR MORTGAGE, LLC,<br><br>      Defendant. | **COMPLAINT TO:**<br>  **(1) DETERMINE THE VALIDITY**<br>     **OF CLAIMANT'S LIEN;**<br><br>  **(2) FOR DECLARATORY**<br>     **JUDGMENT DISALLOWING IN**<br>     **ITS ENTIREITY CLAIM NO. 9-1**<br>     **(AND AMENDMENTS**<br>     **THERETO), FILED BY**<br>     **NATIONSTAR MORTGAGE,**<br>     **LLC** |

ALLANA BARONI, debtor and debtor in possession and plaintiff, ("Plaintiff" or

"Debtor") complains (the "Complaint") and alleges against, NATIONSTAR MORTGAGE, LLC,

("Defendant" or "Claimant" or "Nationstar"), as follows:

2210.001

ADVERSARY COMPLAINT

## PARTIES

1.      Baroni is an individual residing in the County of Los Angeles, State of California.

2.      On February 1, 2012, Debtor filed a bankruptcy petition under Chapter 13 of the Bankruptcy Code ("Code").  On February 29, 2012, the case was converted to Chapter 11. The Debtor continues to manage her financial affairs as debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108, assigned case number 1:12-BK-10986-AA (the "Case").

3.      Plaintiff is informed and believes that Defendant is an entity doing business in the state of California.

4.      Defendant has filed a proof of claim in Debtor's Case, in which it asserts a secured claim in the amount of $1,480,705.83 (the "Claim"), which is purportedly secured by real property located at 3435 Rio Road, Carmel, California ("the Property").

5.      Defendant purports to be the holder of that certain note and corresponding deed of trust, recorded as instrument number 2004019928 on March 4, 2004 in the County of Monterey, California ("Security Interest").

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 in that it arises in or is related to the above-captioned case under Chapter 11 of the United States Bankruptcy Code.

7.      The above-captioned Chapter 11 Case is currently pending before the Honorable Alan Ahart of the Bankruptcy Court for the Central District of California.

8.      This action is a "core proceeding" under 28 U.S.C. § 157(b)(2).

9.      Venue of this action is proper under 28 U.S.C. § 1408 and 1409, in that it arises in or relates to the Case under Chapter 11 of the United States Bankruptcy Code, which is presently pending in the Central District of California.

///

///

2210.001

ADVERSARY COMPLAINT

## GENERAL ALLEGATIONS

10.    On February 26, 2004 a Deed of Trust and Promissory Note, to effectuate the refinancing of the Property, was executed. Platinum Capital Group is identified on the instruments as the "Lender."    MERS Mortgage Electronic Registration Systems, Inc. is identified as the nominee for the Lender and the "Beneficiary."

11.    The proof of claim filed by Claimant, Nationstar fails to attach sufficient competent evidence showing that Claimant holds the Security Interest, as described herein. A true and correct copy of the proof of claim is attached hereto as **Exhibit A**.

12.    In October 2010, Debtor forwarded a Qualified Written Request under the HUD RESPA Statute requesting Aurora, the servicer, to identify the current owner of the debt. Debtor included a request for current copies of the Deed of Trust and Promissory Note including all assignments and endorsements along with a copy of the loan file.

13.    The Debtor disputes that the Claimant is the holder in due course of the Note ("Note") or the beneficiary under the Deed of Trust ("DOT"), and is therefore with without standing to file a proof of claim.

14.    The Baroni Adjustable Rate Note filed by Claimant identifies Platinum Capital Group as the "Lender." The Note contains three undated, unauthenticated, stamped endorsements (including two stamped signatures) on the back of the signature page: (a) To Lehman Brothers Bank, FSB from Platinum Capital Group; (b) To Lehman Brothers Holdings, Inc., from Lehman Brothers Bank, FSB; and (c) An endorsement in blank from Lehman Brothers Holdings, Inc.The Note is not endorsed to Nationstar Mortgage, LLC.

15.    As set forth below, the documentation provided to the Debtor from the Claimant pursuant to FBRP 2004, indicates that the Debtor's loan was pledged to Structured Adjustable Rate Mortgage Loan Trust Pass-Through Certificates, Series 2004-5 ("SARM 2004-5") and remains pledged to the trust through to the present. The documentation further identifies Aurora Loan Services as the Master Servicer for the Real Estate Mortgage Investment Conduit SARM 2004-5.

3

a. July 7, 2011 written communication from the law firm MTW McGinnis Tessitore Wutscher LLP attached hereto as **(Exhibit "B")** advising Debtor, "Aurora states the Mortgage Loan was transferred to Wells Fargo Bank N.A. in trust for Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-5, on or around April 29, 2004."

b. Lehman Brothers Confidential Foreclosure Referral Form dated February 6, 2012 attached hereto as **(Exhibit "C"),** identifying SARM 2004-5 as the "Investor."

c. Lender Processing Services and Aurora Bank FSB internal document attached hereto as **(Exhibit "D")** which, identifies the "Investor" as SARM 2004-5

d. Internal Aurora Loan Services, Inc. servicing platform document dated February 6, 2012 attached hereto as **(Exhibit "E")** which, identifies the investor as SARM 2004-5 and identifies the "Contract / Pool No" as SARM 2004-5 .

e. Two written communications dated January 12, 2012 and May 24, 2012 from Wells Fargo Corporate Trust Services addressed to Aurora Master Servicing attached hereto as **(Exhibit "G")** The January 12, 2013 communication includes an insurance renewal certificate which, identifies the Mortgagee as "Wells Fargo Bank, National Association, as Trustee" and also identifies two Aurora Loan Services loan numbers associated with the Debtor's property.  The May 24, 2012 communication identifies Aurora Master Servicing as the "Servicer-in-Fact."

f. Clarification from Claimant's counsel identifying the SEC filings of SARM-2004-5, as their response to Debtor's FRBP 2004 request for copies of recourse agreements associated with her loan, attached hereto as **(Exhibit "H")**.

16.    If in fact, as the evidence would indicate, the "Holder" of the Note is SARM 2004-5 with Wells Fargo Bank NA as Trustee, it is required that the Claimant must establish its standing by a chain of ownership. In *In re Hayes*, 393 B.R. (Bankr. D. Mass., 2008), the

4

1   court noted that both it and the debtor are entitled to insist that the moving party establish its

2   standing in a motion from relief from stay through the submission of an accurate history of the

3   claim of the mortgage. Absent such proof, relief from the stay is unwarranted and a proof of

4   claim filed by the moving party, to which an objection is filed, must be disallowed, *Id* at 269.

5       17.    The Claimant has not proved that it is the "Holder" of the Note with standing

6   to bring a claim. This is not a technical requirement since the Debtor could be exposed to "the

7   danger that multiple holders would seek foreclosure [and money judgment] based upon the

8   same note and mortgage." *Washington Mut. Bank. F.A. v. Green*, 156 Ohio App. 3d 461

9   (2004).

10      18.    The DOT identifies Platinum Capital Group as the "Lender" and MERS

11  Mortgage Electronic Registration Systems, Inc. as nominee for the Lender and is the

12  "Beneficiary" under the security instrument.

13      19.    The Claimant provided in their discovery response, an unrecorded Corporate

14  Assignment of Deed of Trust ("Assignment") from Platinum Capital Group to Aurora Bank,

15  FSB executed on December 12, 2011 by Regina Lashley as a Vice President of Mortgage

16  Electronic Registrations, Inc. attached hereto as (**Exhibit "I"**) Ms. Lashley was an employee

17  of Aurora in 2011 and is currently an employee of Nationstar.

18      20. The Assignment states:

19          "For Value received, MORTAGE ELECTRONIC REGISTRATIN SYSTMES,
           INC. AS NOMINEE FOR PLATINUM CAPITAL GROUP, ITS SUCCESSORS
20         AND/OR ASSIGNS hereby, assigns and transfers to AURORA BANK FSB at
           2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361 all beneficial interest under
21         that certain Deed of Trust dated 02/26/2004, executed by JAMES BARONI, A
           MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY to
22         MORTGAGE ELECTRONIC RESITRATION SYSTEMS, INC. AS NOMINEE
           FOR PLATINUM CAPITAL GROUP and recorded 03/04/2004 in
23         Book/Reel/Liber: N/A as Instrument No 2004019928 in the County of Monterey,
           State of California.

24

25

26

27

5

21.      Despite a request to Claimant for all documents relevant to their claim, there appears to be no documents to reflect that Aurora Bank, FSB has assigned the DOT to the Claimant.  As such, there is no evidence that the Claimant has standing to enforce the DOT. Attached hereto as **Exhibit "F"** is  a true and correct copy of a screen shot from MERS Mortgage Electronic Registration ("MERS") borrower's portal dated March 30, 2013, which identifies "Wells Fargo as Trustee" as the "Investor."  Upon information and belief, the note and deed have been separated and are held by separate entities.

22.      In the landmark case *In re Veal,* 450 B.R. 897 (B.A.P. 9th Circuit 2011), the court held that a party has standing to prosecute a proof of claim involving a negotiable promissory note secured by real property, if under applicable law, it is a "person entitled to enforce the note" as defined by the Uniform Commercial Code. The court found that Wells Fargo lacked standing because the purported assignment did not contain language effecting the assignment of the note. The reference to the note served only to identify the mortgage and once the note is separated from the deed of trust the note becomes unsecured.

23.      California case law in regards to non-judicial foreclosures sets forth that it is not fatal to the rights of the claimant if the note is not in their possession.  In the instant case, however, there is no non-judicial foreclosure proceeding pending and therefore the holding in *In re Veal*  450 B.R. 897 (B.A.P. 9th Circuit 2011), and Articles 3 and 9 of the Uniform Commercial Code should apply.

24.      Based on the absence of any evidence obtained through Debtors FRBP 2004 subpoena, or attached to Claimant's proof of claim, Nationstar Mortgage, LLC has not proved it is a holder of the note or the <u>beneficiary of the deed of trust</u> with standing to file a proof of claim.

25.      A claimant filing a proof of claim must attach copies of writings upon which claims are based in order to carry its burden of establishing a *prima facie* case against the debtor. *Hardin v. Gianni (In re King Investments Inc.),* 219 B.R. 848, 858 (B.A.P. 9th Cir. 1998). Further, a claim should not be allowed if that claim is unenforceable against the debtor

2210.001

ADVERSARY COMPLAINT

1    and property of the debtor, under any agreement or applicable law. 11 U.S.C. § 502 (b)(1). In

2    addition, Bankruptcy Rule 3001(c) provides that "[w]hen a claim, or an interest in property of

3    the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed

4    with the proof of claim." If the writing has been lost or destroyed, "a statement of the

5    circumstances of the loss or destruction shall be filed with the claim." *Id.* Bankruptcy Rule

6    3001(d) further provides, "[i]f a security interest in property of the debtor is claimed, the proof

7    of claim shall be accompanied by evidence that the security interest has been perfected."

8    Official Form 10, as prescribed by the Judicial Conference of the United States, also requires a

9    creditor to attach supporting documentation to the proof of claim. "[T]he documentation

10   required by Bankruptcy Rule 3001 and Official Form 10 allows the debtor . . . to have enough

11   information to fully determine whether or not a valid claim in the proper amount has been

12   filed." *In re Armstrong*, 320 B.R. 97, 104 (N.D. Tex. 2005). BNY has failed to meet this

13   burden. Claimant has not satisfied the burden of proof.

14       26.    Plaintiff reserves all rights, consistent with the local rules of this district, oders

15   of the Court, and any applicable law, to amend, modify and/or supplement this Complaint.

16   Therefore, Plaintiff may raise additional objections to the Claim.

17

18   ## FIRST CLAIM FOR RELIEF

19   ### (For a Judgment Disallowing the Claim in its Entirety)

20       27.    Plaintiff re-alleges and incorporates by this reference each and every allegation

21   set forth above, inclusive, as though fully set forth herein.

22       28.    Plaintiff is entitled to an order and judgment determining that the Claim is

23   disallowed in its entirety.

24   ///

25   ///

26   ///

27   ///

2210.001

ADVERSARY COMPLAINT

## SECOND CLAIM FOR RELIEF

### (For a Judgment Avoiding

### the Security Interest)

29.    Plaintiff re-alleges and incorporates by this reference each and every allegation set forth above, inclusive, as though fully set forth herein.

30.    Plaintiff is entitled to an order and judgment avoiding the Security Interest.

## THIRD CLAIM FOR RELIEF

### (Restitution/Unjust Enrichment)

31.    Plaintiff re-alleges and incorporates by this reference each and every allegation set forth above, inclusive, as though fully set forth herein.

32.    Plaintiff is informed and believes that Defendant received payment from or on behalf of Debtor on account of the Claim in an amount to be determined at trial. To the extent Defendant received payments from or on behalf of Debtor on account of the Claim, Defendant received a benefit and unjustly retained the benefit at the expense of another; and therefore was unjustly enriched thereby.

///
///
///
///
///
///
///
///
///
///
///
///

8

1    **WHEREFORE,** Plaintiff prays that this Court enter judgment against Defendant as

2    follows:

3        a.  For a determination and judgment disallowing the entirety of Defendant's

4           Claim and any amendments thereto;

5        b.  For a determination and judgment avoiding the Security Interest;

6        c.  For the recovery of all sums paid by Debtor to Defendant on account of

7           Defendant's purported claim;

8        d.  For reasonable attorneys' fees and costs of suit; and

9        e.  For such other and further relief as this Court deems just and proper.

10

11    April 2, 2013                                                MICHAEL S. RILEY

12

13

14                                        Michael S. Riley
Special Counsel for Debtor and Debtor in

15                                        Possession, Allana Baroni

16

17

18

19

20

21

22

23

24

25

26

27

2210.001

ADVERSARY COMPLAINT

EXHIBIT "A"

| UNITED STATES BANKRUPTCY COURT | FOR THE CENTRAL DISTRICT OF CALIFORNIA SAN FERNANDO VALLEY DIVISION | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:   Allana Baroni | Case Number:   SV12-10986-AA |
|---|---|

**NOTE:** *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.
You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Nationstar Mortgage, LLC

**COURT USE ONLY**

Name and address where notices should be sent:
Nationstar Mortgage, LLC
Bankruptcy Department
350 Highland Drive
Lewisville, Texas 75067

Telephone Number: (800) 766-7751        email:

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____

*(If Known)*

*Filed on* _____

Name and address where payment should be sent: (if different from above):
Nationstar Mortgage, LLC
Bankruptcy Department
350 Highland Drive
Lewisville, Texas 75067

Telephone Number: (800) 766-7751        email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**        $1,480,705.83

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**        Money Loaned
(See instruction #2)

| **3. Last four digits of any number by which the creditor identifies debtor:**  xxxxxx5132 | **3a. Debtor may have scheduled account as:**  (See instruction #3a) | **3b. Uniform Claim Identifier (optional):**  (See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien or property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of Property or right of setoff:** ☒ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**        3435 Rio Road, Carmel, California 93921

**Value of Property:** _____

**Annual Interest Rate:**   3.0000%   ☐ Fixed  or  ☒ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$46,981.88

**Basis for perfection:**        Recordation of Lien

**Amount of Secured Claim:**        $1,480,705.83

**Amount of Unsecured:** _____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a) (1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier - 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family or household use - 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) (__).

**Amount entitled to priority:**

_____

*Amounts are subject to adjustment on 04/01/2013 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10Form_Ver001 : 4576-N-5258

B 10 (Official Form 10) (12/11)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted copies of** documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted.")*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.  ☒ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor.  ☐ I am a guarantor, surety, indorser, or other
   (Attach copy of power of attorney, if any.)  (See Bankruptcy Rule 3004.)  codebtor.  (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

| | |
|---|---|
| Print Name: | Craig A. Edelman |
| Title: | Authorized Agent for Nationstar Mortgage, LLC |
| Company: | Brice, Vander Linden & Wernick, PC |

/s/ Craig A. Edelman
Signature

Address and telephone number (if different from notice address above):
   P. O. Box 829009
   Dallas, TX 75382-9909

09/15/2012
Date

Telephone:  (972) 643-6600    Email:    pocinquiries@bkcylaw.com

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

B10Form_Ver001 : 4576-N-5258

B 10 (Attachment A) (12/11)
Chapter: 11

FOR THE CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION
Judge: Alan M. Ahart    Trustee: :

## Mortgage Proof of Claim Attachment

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim.** See Bankruptcy Rule 3001(c)(2).

| | | | |
|---|---|---|---|
| **Name of debtor:** | Aliana Baroni | **Case Number:** | SV12-10986-AA |
| **Name of creditor:** | Nationstar Mortgage, LLC | **Last four digits** of any number you identify the debtor's account: | xxxxxx5132 |

## Part 1: Statement of Principal and Interest Due as of the Conversion Date (02/29/2012)

Itemize the principal and interest due on the claim as of the conversion date (include in the Amount of Claim listed in item 1 of your Proof of Claim form).

1. **Principal due**                                                                           (1)   **$1,430,000.00**

2. **Interest due**

| Interest Rate | From | To | Amount |
|---|---|---|---|
| 3.125% | 01/01/2011 | 04/30/2011 | $14,895.83 |
| 3.000% | 05/01/2011 | 02/29/2012 | $35,750.00 |

   **Total interest due as of the Conversion date $50,645.83**     Copy total here  **>**  (2)   **+ $50,645.83**

3. **Total principal and interest due**                                                        (3)   **$1,480,645.83**

## Part 2: Statement of Pre-Conversion Fees, Expenses, and Charges

Itemize the fees, expenses, and charges due on the claim as of the conversion date (include in the Amount of Claim listed in Item 1 on the Proof of Claim form).

| Description | | Dates incurred | Amount |
|---|---|---|---|
| 1. | Late Charges | | (1) |
| 2. | Non-sufficient funds (NSF) fees | | (2) |
| 3. | Attorney fees | | (3) |
| 4. | Filing fees and court costs | | (4) |
| 5. | Advertisement costs | | (5) |
| 6. | Sheriff/auctioneer fees | | (6) |
| 7. | Title costs | | (7) |
| 8. | Recording fees | | (8) |
| 9. | Appraisal/broker's price opinion fees | | (9) |
| 10. | Property inspection fees | 1 @ $15.00 incurred on 08/03/11<br>1 @ $15.00 incurred on 09/02/11<br>1 @ $15.00 incurred on 12/30/11<br>1 @ $15.00 incurred on 01/25/12 | (10)  $60.00 |
| 11. | Tax advances (non-escrow) | | (11) |
| 12. | Insurance advances (non-escrow) | | (12) |
| 13. | Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | | (13) |
| 14. | Property preservation expenses. | | (14) |
| 15. | Other. | | (15) |
| 16. | **Total preconversion fees, expenses, and charges.** Add all of the amounts listed above. | | (16)  $60.00 |

EXAForm_Ver001
4576-N-5258

1

B 10 (Attachment A) (12/11)                          FOR THE CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION
Chapter: 11                                                                              Judge: Alan M. Ahart          Trustee: :

## Part 3: Statement of Amount Necessary to Cure Default as of the Conversion Date

**Does the installment payment amount include an escrow deposit?**
☒  No
☐  Yes. Attach to the Proof of Claim form an escrow account statement prepared as of the **conversion** date in a form consistent with applicable nonbankruptcy law.

| | | | | |
|---|---|---|---|---|
| 1. | **Installment payments due** | Date last payment received by creditor | | 01/18/2011 |
| | | Number of installment payments due: | (1)  <u>13</u> | |

2.  **Amount of installment payments due**

| | | |
|---|---|---|
| February 2011 to April 2011 | 3 P&I installments @ $3,723.96 = | $11,171.88 |
| May 2011 to February 2012 | 10 P&I installments @ $3,575.00 = | $35,750.00 |
| | Total installment payments due as of the preconversion date <u>$46,921.88</u> | Copy total here  > (2)  <u>$46,921.88</u> |

3.  **Calculation of cure amount**

<u>Add</u> total preconversion fees, expenses, and charges     Copy total here Part 2  >  + $60.00

<u>Subtract</u> total of unapplied funds (funds received but not credited to account)          $0.00

<u>Subtract</u> amounts for which debtor is entitled to a refund                    _____

Total amount necessary to cure default as of the conversion date          (3)  **$46,981.88**

Copy total onto Item 4 of Proof of Claim form

Your monthly payment amount may change due to an escrow requirement and/or interest rate adjustment.
Your current payment amount including escrow and any upcoming changes are provided below:

| <u>Effective Date</u> | <u>Effective Amount</u> |
|---|---|
| 03/01/2012 | $3,575.00 |

EXHIBIT "A"



# ADJUSTABLE RATE NOTE
### (1 Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

FEBRUARY 26, 2004          IRVINE                 CALIFORNIA
    [Date]                   [City]                  [State]
           3435 RIO ROAD, CARMEL, CALIFORNIA 93921
                        [Property Address]

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 1,430,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender  The Lender is PLATINUM CAPITAL GROUP
I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    5.500 %.  The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
(A)  Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the  1st   day of each month beginning on MAY 1 2004    I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal  If, on APRIL 1, 2034      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 17101 ARMSTRONG AVENUE SUITE 200, IRVINE, CALIFORNIA 92614
                                    or at a different place if required by the Note Holder.

(B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 8,119.38      This amount may change.

(C)  Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial interest rate I will pay may change on the 1st day of APRIL, 2009 , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000 percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.500 % or less than 2.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000 percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 10.500%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY **See attached Addendum to Note.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

---

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family—Freddie Mac MODIFIED INSTRUMENT
Form 3548 1/01                                    Page 2 of 6

DocMagic *EPIERMS* 800-649-1362
www.docmagic.com

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

---

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family-Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                        Page 3 of 6

DocMagic eForms  800-649-1362
www.docmagic.com

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A)** UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B)** AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3546    1/01    Page 4 of 6

DocMagic ℰℱℴℛℳℴ  800-6-3-1362
www.docmagic.com

made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration   The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                                    Page 5 of 8

DocMagic ℮™ 800-649-1362
www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
JAMES J. BARONI          -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

*[Sign Original Only]*

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)          DocMagic *€Ruxms* 800-649-1362
Single Family--Freddie Mac MODIFIED INSTRUMENT                                   *www.docmagic.com*
Form 3546  1/01                                    Page 6 of 6

Us3546 bor 6 han

PAY TO THE ORDER OF

LEHMAN BROTHERS BANK FSB
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY _____
ASST SECRETARY

Carleton Pytron

PAY TO THE ORDER OF

WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.

X: _____
RALPH A. ORZO III
AUTHORIZED SIGNATORY

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY _____
RICK W. SKOGG
VICE PRESIDENT

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE PROMISSORY NOTE

Property Address: 3435 RIO ROAD, CARMEL, CALIFORNIA 93921

THIS ADDENDUM is made this 26th day of FEBRUARY    2004      , and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to PLATINUM CAPITAL GROUP, A CALIFORNIA
CORPORATION                                                                (the Lender).

THIS ADDENDUM supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this Addendum

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the first day of each month beginning on MAY 1, 2004   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on APRIL 1, 2034       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 17101 ARMSTRONG AVENUE SUITE 200, IRVINE,
CALIFORNIA 92614
                                                  , or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 6,554.17             . This payment amount is based on the original principal balance of the Note. This payment amount may change.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                     percentage point(s) (    2.250  %) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the

Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest during the Interest-Only Period, 5.000 % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| JAMES J. BARONI | FEB 27/07 | | |

| Borrower | Date | Borrower | Date |
|---|---|---|---|

| Borrower | Date | Borrower | Date |
|---|---|---|---|

Case 1:13-ap-01069-MB    Doc 1    Filed 04/03/13    Entered 04/03/13 11:12:30    Desc
Main Document    Page 25 of 121
Case 1:12-bk-10986-AA    Claim 9-1 Part 2    Filed 09/17/12    Desc Exhibit    Page 10
of 36

(Page 2 of 25)



Stephen L. Vagnini    RALICIA
Monterey County Recorder    3/04/2004
Recorded at the request of    8:00:00
**Fidelity Title**

DOCUMENT: **2004019928**   Titles 1/ Pages 24

Fees ......... 77.00
Taxes .........
Other .........
AMT PAID   $77.00

Recording Requested By:
PLATINUM CAPITAL GROUP

And After Recording Return To:
PLATINUM CAPITAL GROUP
17101 ARMSTRONG AVENUE SUITE 200
IRVINE, CALIFORNIA 92614

[Space Above This Line For Recording Data]

## DEED OF TRUST

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   FEBRUARY 26, 2004   , together with all Riders to this document.
**(B)** "Borrower" is JAMES J. BARONI, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument.
**(C)** "Lender" is PLATINUM CAPITAL GROUP

Lender is a CALIFORNIA CORPORATION       organized
and existing under the laws of CALIFORNIA
Lender's address is 17101 ARMSTRONG AVENUE SUITE 200, IRVINE, CALIFORNIA
92614

**(D)** "Trustee" is FIDELITY NATIONAL TITLE COMPANY
378 FIFTH STREET, HOLLISTER, CALIFORNIA 95023

**(E)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)** "Note" means the promissory note signed by Borrower and dated FEBRUARY 26, 2004
The Note states that Borrower owes Lender ONE MILLION FOUR HUNDRED THIRTY
THOUSAND AND 00/100     Dollars (U.S. $1,430,000.00    ) plus interest.

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  MERS    DocMagic *&reg;* 800-649-1362
Form 3005 01/01      Page 1 of 14      www.docmagic.com

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
APRIL 1, 2034.

(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.

(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☒ 1-4 Family Rider | ☐ Biweekly Payment Rider | INTEREST ONLY ADDENDUM TO RIDER |

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.

(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.

(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

(M)  "Escrow Items" means those items that are described in Section 3.

(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in
lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note,
plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter. As used in this Security Instrument,
"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan"
even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that
party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and
assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of
the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants
and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of                      MONTEREY
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of   3435 RIO ROAD

[Street]

CARMEL            , California    93921                              ("Property Address"):
[City]                                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security
Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors
and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose
and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling
this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right
to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any
encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall
pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late
charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due
under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other
instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid,
Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in
one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,
treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured
by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other
location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return
any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender
may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights
hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not
obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of
its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds

until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 4 of 14                    DocMagic eForms 800-649-1362
                                                                                   www.docmagic.com

Case 1:13-ap-01069-MB    Doc 1    Filed 04/03/13    Entered 04/03/13 11:12:30    Desc
Main Document    Page 29 of 121
Case 1:12-bk-10986-AX    Claim 9-1 Part 2    Filed 09/17/12    Desc Exhibit    Page 14
of 36

(Page 6 of 25)

such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an

additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave

materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate

payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law.  Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order:  (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23.  Reconveyance.  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24.  Substitute Trustee.  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.  Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25.  Statement of Obligation Fee.  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)                    _____ (Seal)
JAMES J. BARONI                      -Borrower                              -Borrower

_____ (Seal)                    _____ (Seal)
                                     -Borrower                              -Borrower

_____ (Seal)                    _____ (Seal)
                                     -Borrower                              -Borrower

Witness:                                          Witness:

_____                    _____

State of California                          )
                                            ) ss.
County of ~~MONTEREY~~ LOS Angeles ) TJS

On February 27, 2004 before me, Teresa J. Smith, Notary Public

personally appeared  JAMES J. BARONI

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY SIGNATURE

Teresa J. Smith
(Typed Name of Notary)

NOTARY SEAL

Date: FEBRUARY 26, 2004

Property Address: 3435 RIO ROAD, CARMEL, CALIFORNIA 93921

## EXHIBIT "A"

### LEGAL DESCRIPTION

LOT 19 IN BLOCK 39, AS SHOWN ON THAT CERTAIN MAP ENTITLED OF HATTON FIELDS TRACT
NO. 3-A, BEING A RESUBDIVISION OF PORTIONS OF HATTON FIELDS TRACT. NO. 3 FILED FOR
RECORD JANUARY 5, 1937 IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF
MONTEREY, STATE OF CALIFORNIA, IN VOLUME 4 OF MAPS, CITIES AND TOWNS, AT PAGE 8.

DocMagic eForms 800-649-1362
www.docmagic.com

## ADJUSTABLE RATE RIDER
### (1 Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)

THIS ADJUSTABLE RATE RIDER is made this 26th day of FEBRUARY 25, 2004, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note to PLATINUM CAPITAL GROUP, A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

3435 RIO ROAD, CARMEL, CALIFORNIA 93921
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of        5.500 %. The Note provides for changes in the interest rate and the monthly payments as follows:

### 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A)    Change Dates
The initial interest rate I will pay may change on the   1st  day of APRIL, 2009        , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B)    The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE RIDER–1 Year LIBOR Index
(Assumable after IP)--Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3148  1/01                        Page 1 of 4

DocMagic €Forms 800-649-1362
www.docmagic.com

(C)  Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                    percentage points (      2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than      10.500  % or less than       2.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000 percentage point(s) (      2.000  %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than        10.500 %.

(E)  Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.  UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in

MULTISTATE ADJUSTABLE RATE RIDER–1 Year LIBOR Index
(Assumable after IP)– Single Family–Freddie Mac MODIFIED INSTRUMENT
Form 3148  1/01                    Page 2 of 4

DocMagic €Rorms 800-649-1162
www.docmagic.com

accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2.    AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER- 1 Year LIBOR Index
(Assumable after IP)-- Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3148   1/01                                      Page 3 of 4

DocMagic ℰℱℴ𝓇𝓂𝓈 800-649-1362
www.docmagic.com

(Form 20 of 25)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
JAMES J. BARONI              -Borrower                                    -Borrower


_____ (Seal)        _____ (Seal)
                            -Borrower                                     -Borrower


_____ (Seal)        _____ (Seal)
                            -Borrower                                     -Borrower

MULTISTATE ADJUSTABLE RATE RIDER--1 Year LIBOR Index
(Assumable after IP)-- Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3148  1/01                                    Page 4 of 4

DocMagic Forms 800-649-1362
www.docmagic.com

## 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 26th day of FEBRUARY, 2004 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to  PLATINUM CAPITAL GROUP, A CALIFORNIA
CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3435 RIO ROAD, CARMEL, CALIFORNIA 93921
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY
INSTRUMENT. In addition to the Property described in Security Instrument, the following
items now or hereafter attached to the Property to the extent they are fixtures are added to the
Property description, and shall also constitute the Property covered by the Security Instrument:
building materials, appliances and goods of every nature whatsoever now or hereafter located
in, on, or used, or intended to be used in connection with the Property, including, but not
limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas,
water, air and light, fire prevention and extinguishing apparatus, security and access control
apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and
attached floor coverings, all of which, including replacements and additions thereto, shall be
deemed to be and remain a part of the Property covered by the Security Instrument. All of the
foregoing together with the Property described in the Security Instrument (or the leasehold
estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and
the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek,
agree to or make a change in the use of the Property or its zoning classification, unless Lender
has agreed in writing to the change. Borrower shall comply with all laws, ordinances,
regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not
allow any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.   CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
JAMES J. BARONI          -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                    -Borrower

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                                    Page 3 of 3

DocMagic ℰℱℴℛℳℰ 800-649-1362
www.docmagic.com

03170.rd3.tem

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE RIDER

Property Address: 3435 RIO ROAD, CARMEL, CALIFORNIA 93921

THIS ADDENDUM is made this 26th    day of FEBRUARY, 2004    , and is
incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date
as this Addendum executed by the undersigned and payable to PLATINUM CAPITAL GROUP,
A CALIFORNIA CORPORATION

(the Lender).

THIS ADDENDUM supersedes Section 4(C) of the Rider. None of the other provisions of the Note are
changed by this Addendum.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND 250/1000    percentage point(s) (    2.250 %) to
the Current Index for such Change Date. The Note Holder will then round the result of this addition to the
nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this
rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly
payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment
until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary
prepayment of principal during such period.  If I make a voluntary prepayment of principal during the
Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary
to pay interest at the then current interest rate on the lower principal balance.  At the end of the Interest-Only
Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly
payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end
of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining
term of the Note.  The result of this calculation will be the new amount of my monthly payment.  After the
end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

(Page 24 of 25)

_____ (Seal)          _____ (Seal)
JAMES J. BARONI         -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower


# END OF DOCUMENT

B6A (Official Form 6A) (12/07)

In re  **Allana Ann Baroni**                                          Case No.   **01:12-10986-AA**
_____
                              Debtor

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **3339 Via Verde Ct., Calabasas CA 91302**<br>**5500 sq.ft.; five bedrooms; five baths** | **Fee simple** | **C** | 1,709,973.50 | 1,853,676.32 |
| **Rental property:**<br>**3435 Rio Road, Carmel, CA 92321** | **Fee simple** | **C** | 1,387,500.00 | 1,430,000.00 |
| **Rental property:**<br>**2240 Village Walk Drive, Unit 2311**<br>**Henderson, NV 89052** | **Fee simple** | **C** | 296,169.00 | 809,990.00 |
| **Rental Property:**<br>**5390 Plata Rosa Court, Camarillo, CA** | **Fee simple** | **C** | 1,105,193.00 | 1,379,665.38 |

|  |  |  |
|---|---|---|
| Sub-Total > | **4,498,835.50** | (Total of this page) |
| Total > | **4,498,835.50** |  |

(Report also on Summary of Schedules)

  **0**   continuation sheets attached to the Schedule of Real Property

Software Copyright (c) 1996-2012 - CCH INCORPORATED - www.bestcase.com                    Best Case Bankruptcy

B6D (Official Form 6D) (12/07)

In re    **Allana Ann Baroni**                                                      Case No.    **01:12-10986-AA**
_____
                                    Debtor

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No.<br><br>Audi Financial<br>Post Office Box 3<br>Hillsboro, OR 97123 | | W | Lease<br><br>At residence:<br>2009 Audi Q5<br>(Lease) | | | | | |
| | | | Value $                0.00 | | | | 0.00 | 0.00 |
| Account No.<br><br>Aurora Loan Services<br>Post Office Box 1706<br>Scottsbluff, NE 69363 | X | C | First Mortgage<br><br>Rental property:<br>3435 Rio Road, Carmel, CA  92321 | | | X | | |
| | | | Value $         1,387,500.00 | | | | 1,430,000.00 | 42,500.00 |
| Account No.<br><br>Bank of America Home Loans, LP<br>Bank of America, N.A.<br>100 North Tyron Street<br>Charlotte, NC 28255-0001 | X | C | First Mortgage<br><br>Rental Property:<br>5390 Plata Rosa Court, Camarillo, CA | | | X | | |
| | | | Value $         1,105,193.00 | | | | 1,379,665.38 | 274,472.38 |
| Account No.<br><br>Bank of America, N.A.<br>100 North Tyron Street<br>Charlotte, NC 28255-0001 | X | C | First Mortgage<br><br>Rental property:<br>2240 Village Walk Drive, Unit 2311<br>Henderson, NV  89052 | | | X | | |
| | | | Value $           296,169.00 | | | | 674,992.00 | 378,823.00 |
| | | | Subtotal<br>(Total of this page) | | | | 3,484,657.38 | 695,795.38 |

**1**    continuation sheets attached

B6D (Official Form 6D) (12/07) - Cont.

In re    **Allana Ann Baroni** _____    Case No. __**01:12-10986-AA**__
                              Debtor

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions.) | CODEBTOR | H W J C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No.<br><br>Green Tree Servicing, LLC<br>POB 6172<br>Rapid City, SD 57709 | X | C | Home Equity Line of Credit<br><br>Rental property:<br>2240 Village Walk Drive, Unit 2311<br>Henderson, NV 89052 | | | X | | |
| | | | Value $          296,169.00 | | | | 134,998.00 | 134,998.00 |
| Account No.<br><br>OneWest Bank<br>888 E. Walnut St.<br>Pasadena, CA 91101 | X | C | 08/26/04<br><br>First Mortgage<br><br>3339 Via Verde Ct., Calabasas CA 91302<br>5500 sq.ft.; five bedrooms; five baths | | | X | | |
| | | | Value $        1,709,973.50 | | | | 1,853,676.32 | 143,702.82 |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |

Sheet __1__ of __1__ continuation sheets attached to
Schedule of Creditors Holding Secured Claims

|  | | |
|---|---|---|
| Subtotal<br>(Total of this page) | 1,988,674.32 | 278,700.82 |
| Total<br>(Report on Summary of Schedules) | 5,473,331.70 | 974,496.20 |

EXHIBIT "B"



**McGinnis Tessitore Wutscher LLP**

City Tower – 17th Floor
333 City Boulevard West
Orange, California 92868
Tel. (888) 339-5282
Fax. (866) 581-9302
www.kw-llp.com

Philip H. Franklin
*Of Counsel*
Direct. (714) 366-9536

**Via Regular Mail**

July 7, 2011

Allana Baroni
3339 Via Verde Court
Calabasas, CA 91302

**RE: Response to Purported Qualified Written Request**
**Borrower: James Baroni**
**Property Location: 3435 Rio Road, Carmel, CA 93921**
**Loan No.: ******2807**

Dear Ms. Baroni:

We represent Aurora Loan Services LLC ("Aurora") in connection with the above-named matter. This is not an attempt to collect a debt. Rather, this letter responds to your letter, apparently dated June 20, 2011, concerning the mortgage loan secured by the real estate commonly known as 3435 Rio Road, Carmel, CA 93921 (the "Mortgage Loan").

As you know, in response to your numerous requests, Aurora has provided you with extensive information and documentation related to the Mortgage Loan, including, without limitation, copies of the Note, Deed of Trust, loan origination documents, payment history, payoff statement, beneficiary statement and validation of debt. We ask that you review this information carefully, for most of it is responsive to your current requests.

In your present and prior communications, you allege, or imply, that each of your requests for information is a "Qualified Written Request," under the federal Real Estate Settlement

**CALIFORNIA - ILLINOIS - WASHINGTON, D.C.**



**MTW**

McGinnis Tessitore Wutscher LLP

Procedures Act, 12 U.S.C. 2601, et seq. ("RESPA") and/or the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. ("TILA"). Please be advised Aurora categorically denies that the Mortgage Loan is subject to either RESPA or TILA, for, among other reasons, it is a business purpose loan (credit was obtained for rental property), which is expressly exempt from both RESPA and TILA. Moreover, Section 6 of RESPA (12 U.S.C. § 2605) requires that a "qualified written request" must relate to the servicing of the Mortgage Loan. Many of your questions do not relate to the servicing of the Mortgage Loan. To the extent that statements in your letter consist of allegations of wrongdoing or liability of any nature by Aurora, all such allegations are denied.

Subject to and without waiving any objections, Aurora responds to your current letter as follows:

*Please provide the following information about the loan:*

*Request 1) The date Lehman Brothers Bank, FSB purchased the Deed and Note.*

Response: Objection, this request is vague and ambiguous with respect to the term "deed." Subject to and without waiving any objections, Aurora states the Mortgage Loan was transferred to Lehman Brothers Bank, FSB on or around March 17, 2004.

*Request 2) The date Lehman Brothers Bank, FSB sold the Deed and Note to Lehman Brothers Holdings, Inc.*

Response: Objection, this request is vague and ambiguous with respect to the term "deed." Subject to and without waiving any objections, Aurora states the Mortgage Loan was transferred to Lehman Brothers Holdings, Inc. on or around April 1, 2004.

*Request 3) The date Lehman Brothers Holdings, Inc. sold the Deed and Note to the depositor of the trust.*

Response: Objection, this request is vague and ambiguous with respect to the terms "deed" and "depositor of the trust." Subject to and without waiving any objections, Aurora states the Mortgage Loan was transferred to Wells Fargo Bank, N.A., in trust for Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-5, on or around April 29, 2004.

*Request 4) The complete name of the trust that is the current creditor of the debt, as well as the names of any other owners of the Deed and Note since origination.*

Response: Objection, this request is vague and ambiguous with respect to the terms "trust" and "deed." Subject to and without waiving any objections, Aurora states it has

# MTW

**McGinnis Tessitore Wutscher LLP**

sufficiently identified the current owner of the Mortgage Loan in its letter to you, dated June 16, 2011, as well as in prior response letters to you, and asks that you carefully review that information.

*Request 5) Please provide a debt validation letter.*

Response: Objection, this request is vague and ambiguous with respect to the terms "debt validation letter." Subject to and without waiving any objections, Aurora states it provided a validation of the debt of the Mortgage Loan in its letter to James Baroni, dated December 29, 2010, and asks that you carefully review that letter and the accompanying documentation.

*Request 6) Please provide a payoff demand letter.*

Response: Please see the enclosed Beneficiary Statement and attachments.

*Request 7)   Please provide a beneficiary statement showing all payments made to the creditor of this debt, including payments made from the servicer and/or master servicer.*

Response: Objection, this request is vague and ambiguous with respect to the terms "beneficiary statement," "creditor of this debt," and "payments made from the servicer." Subject to and without waiving any objections, Aurora refers you to the enclosed second Beneficiary Statement, which is provided pursuant to California Civil Code Section 2943.

We trust this letter is responsive to your inquiries.   Kindly direct all further communications concerning this letter to the address and contact information above.  Thank you.

Sincerely,

Philip H. Franklin

Enc.

EXHIBIT "C"

**FC Referral Pkg: 0017362807**

## Foreclosure Referral Form

| Loan Number | 0017362807 | Mortgagor | JAMES BARONI | | State | CA |
|---|---|---|---|---|---|---|

| Messages: | Ready for Review | | Reviewer ID | mvasquez |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Mortgager Name: | JAMES BARONI | Co-Mort Name: | None | |
| SSN Number: | 408740648 | SSN Number: | 000000000 | |
| Property Address: | 3435 RIO RD CARMEL CA 93923 | County: | | |
| Mailing Address: | 3339 VIA VERDE CT CALABASAS CA 91302 | Monterey | | |

| | | | | **Processor Notes** |
|---|---|---|---|---|
| Due Date: | 02/01/2011 | Office Code: | M3 | |
| Deliqent Payments: | 13 | Investor Code: | SARM 2004-5 | |
| Interest Rate: | 3.125 | Unpaid Princ. Balance: | $1,430,000.00 | |
| Loan Type: | 13 Conventional Arm | Original Loan Amount: | $1,430,000 | |
| Loan Date: | 02/28/2004 | Property Type: | 1 | |
| Payment Amount: | $3,723.96 | | | |
| Suspense Balance: | $0 | Demand Date: | 3/23/11 CL700 | |
| MI Company: | | Last Payment Posted: | 01/18/2011 LST FNDS 1/18/11 | |
| Date Last Inspected: | 01/20/2012 | BIP Letter Date: | 03/18/2011 | |
| Occupancy Status: | TENANT OCCUPIED | Property Condition: | | |
| Modified Date: | None | Open Tasks: | SIUDET: due 11/06/2015 | |
| Man Code: | 0 | | SIUINV: due 03/02/2012 | |
| Disbursement Stop: | 0 | | | PRCHSD AS INVSMNT |
| No Notice Stop: | 0 | | | FORM 1 BOX 1 ADD INFO |
| Process Stop: | 0 | | | ORIG DATE 02/26/04 DMD |
| No Analysis Stop: | | 231/232 Risk? | | 3/23/11 CL700 |
| Builder Broker Code: | R304 | Multiple Loans? | None | |
| Investor Code: | C16 | Corp Advance Balance: | $90.00 | |
| Reason for Default: | 30 | Escrow Balance: | Clear $0 | |
| Previous FC Attorney: | None | Last BPO Info: | None | |
| Class Code: | Not TX/SSA | Additional Borrower? | No Additional Borrowers | |
| Loss Mitigation: | Not Active | BK Dismissal Date: | BK Not Filed | |
| Foreclosure Status: | None | BK Attorney: | None | |
| HAMP Flag | NU | Ran Pacer | YES | |
| HAMP Eligible/Not Eligible | EXCDS LN LMTS TO QUAL | Ran Soldiers Sailors | YES | |
| HAMP Letters/Date | | Is this a Combined Loan | NO | |
| HAFA Flags | NNO | Collateral imaged date | | 02/02/2012 |
| HAFA Eligible/Not Eligible | EXCDS LN LMTS TO QUAL | | | |
| HAFA Letters/ Date: | | | | |

| | | | |
|---|---|---|---|
| OPTIONS DISCUSSED: | DSCSSD | | |
| Repay Plan/Special FB: | DSCSSD | **Is this a late Referral?** | |
| Modification/Refinance: | DSCSSD | YES | |
| Partial Claim: | DSCSSD | INV HOLD CFD LGL TSK | |
| Refinace or Short Sale: | DSCSSD | | 06/17/2011 |
| Deed-In-Lieu: | DSCSSD | **Late/Delay Days** | 265 |
| Collection Repay Plan: | DSCSSD | | |

RECOMMENDATION:    FORECLOSE ( )  Presented by:

*Amber N Jackson*

Foreclsr Rvw Procssr:                                        DATE:        2/6/2012

Based on the information received, the recommendation is:        None

DISAPPROVED:          REFER TO COLLECTOR ( )
                            REFER TO DEFAULT REPORTER ( )
                            REFER TO LOSS MITIGATION ( )        Hold Date:

REASON:                                                        Send to Committee Member
APPROVED:            TRANSFER TO FORECLOSURE ( )        1st LEGAL DATE: 03/04/2012        Yes
Reviewed by Foreclosure Review Committee                FC ATTY: WOLF ATTY
                                                        Processor: M76 AIMEE

                                                        Send to Supervisor

Committee Member                            DATE

**FC Referral Pkg: 0017362807**

| | | Send to AVP | |
|---|---|---|---|
| | | NO | ▼ |
| Supervisor or Committee Member | DATE | | |

_Mirabu Vazquez_

2/6/2012

| Assistant Vice-President or above | DATE | | |

Nationstar's Response to Baroni's RPD Set One - Page 000766

EXHIBIT "D"



Please ensure compliance with FNMA guidelines when FNMA is the investor:

1. Attend the initial meeting of creditors for all bankruptcy cases involving cramdowns. Question the debtor about his or her valuation of the property, the budget, and the proposed plan payments to ascertain whether there are grounds for objecting to the plan based on its lack of feasibility. Please see the 01-01-2011 FNMA guideline for further instruction on this subject.

2. File a Notice of Appearance to ensure your firm will receive all notices and pleadings related to the case and review them to determine whether they affect Fannie Mae's interest in the mortgage loan.

3. Review the Schedule of Assets and Liabilities and Statement of Affairs to seek answers to the questions outlined in the 01-01-2011 FNMA guideline.

4. If Motion for Relief is not feasible due to debtor's equity in the property, your firm should request that a deadline be established for the trustee to market and sell the property and that the stay be lifted if this deadline is not met.

Loss mitigation:

When the borrower is contractually delinquent, contact the borrower's counsel to discuss the different foreclosure prevention alternatives that might be suitable for the borrower. (If counsel does not represent the borrower, the bankruptcy attorney may contact the borrower directly.) The contact number for loss mitigation is: 800-550-0509.

Document affected loss mitigation files in Clarifire.



| Name: | James Baroni |
|---|---|
| Account number: | 0017362807 |
| BK Date Filed: | 2/29/2012 |
| BK Atty: | Wolf Group |
| Investor: | C16 002   SARM 2004-5 |

| 1st Post Pet Pymt Due Date | 3/1/2012 | Date Last Pymt Rec by Creditor | 1/18/2011 |
|---|---|---|---|
| 1st Post Petition Payment Amount | 3723.96 | | |

## SER1/HIST:

| PRE PETITION DUE DATE | PRE PETITION PAYMENT AMOUNT | PRE PETITION PAYMENT TOTAL |
|---|---|---|
| 2/1/11-4/1/11 | 3,723.96 | 11,171.88 |
| 5/1/11-2/1/12 | 3,575.00 | 35,750.00 |

**Total Payments Due**

$46,921.88

## ANA1/LAST:

Escrow Deficiency

$0.00

## DDCH (LMES):

Loss Mit Escrow (Stat Exp)

$0.00

EXHIBIT "E"

```
MAS1 LOAN 0017362807    MSP LOAN MASTER MAINT. & DISPLAY   02/06/12    05:02:17
      NAME J BARONI     TYPE 13 1ST MTG,CONVEN W/O INS  (ARM)        GROUP
-- INV1 -- INVESTOR, SERVICE FEES----------------------------------------------
INV CAT   INV LOAN NO   SALE/REPURCH  --- FNMA LASER ---   FNMA DEL
C16 002   0017362807    FLAG  DATE  CD  DATE  CHANGED      STATUS
                          S    ____  __  _____             0 (0-9)
INV SARM 2004-5                      (MMDDYY)      SSRI ___
HDR AURORA LOAN SERVICES,INC    GUAR FEE   ----SERVICE FEE----
    10350 PARK MEADOWS DRIVE     RATE     % RATE  OR $ AMOUNT
    LITTLTON, CO  80124         00.00000 %  .000000     0.00
    ATTN: INVESTOR ACCT                   FRC   SC ACC CD  INT IN ADV BAL
                                                                    .00
                                           __    __  ___
CONTRACT/POOL NO   INV SCHED DEF INT   INV ACT DEF INT   INV SCHED PRIN BAL
SARM 2004-5                      .00              .00       1,430,000.00
---THIRD PARTY SERVICE FEES---   FHLMC   ------EXCESS SERVICE FEES-----
CORRESPONDENT  PLAN  1ST REMIT   INACT   ORIG SERV FEE:    _____
    CODE       CODE    DATE        _     UNAMORT SERV FEE: _____
    ___        ___     _____      GSE    ORIGINAL TERM:      ___
                      (MMYY)      ON _   REMAINING TERM:     ___
CORR/PLAN:                           OPTION: _   DOC CUST: _____
-----------------------------* ADDITIONAL MESSAGES *---------------------------
PRESS PF14 FOR MEMOS
LIFE-OF-LOAN: INT ONLY/ARM
DIST TYPE = I INTEREST ONLY LOAN
```

EXHIBIT "F"

Screen Shot Taken November 16, 2011





EXHIBIT "G"

*17362807 Aurora*



**Corporate Trust Services**
Legal Notice Processing Group
MAC N2702-011
9062 Old Annapolis Road
Columbia, MD 21045
410-884-2052
866-670-8601 FAX
ctslitmanagement@wellsfargo.com
Wells Fargo Bank, NA

Thursday, May 24, 2012

**VIA FedEx**
Aurora Master Servicing - MS Action Notices
Aurora
10350 Park Meadows Drive Mail Stop: 3199
Littleton, CO 80124

RE: Notice of Motion, 3435 Rio Rd, Carmel, CA 93923

Dear Sir or Madam,

Our records indicate that you are the Servicer-in-Fact for the above referenced
property.

Enclosed, please find a(n) **Notice of Motion**. Please respond as appropriate. If
you should have any questions or would like to discuss this matter further, I may
be reached via email at ctslitmanagement@wellsfargo.com.  All correspondence
can be sent to me at the address below:

> Wells Fargo Bank, N.A.
> Attn: Sophy Liv
> 9062 Old Annapolis Road
> Columbia, MD 21045

Thank you for your prompt attention to this matter.

Yours truly,

Sophy Liv
**Paralegal**

Enclosure(s)
cc: file

Together we'll go far



 

 

**Corporate Trust Services**
Legal Notice Processing Group
MAC N2702-011
9062 Old Annapolis Road
Columbia, MD 21045
410-884-2052
866-670-8601 FAX
ctslitmanagement@wellsfargo.com
Wells Fargo Bank, NA

Thursday, January 12, 2012

**VIA FedEx**
Aurora Master Servicing – MS Action Notices
Aurora
10350 Park Meadows Drive
Mail Stop: 3199
Littleton, CO 80124

RE: Insurance Renewal Certificate, 3435 Rio Rd, Carmel, CA 93923

Dear Sir or Madam,

Our records indicate that you are the Servicer-in-Fact for the above referenced property.

Enclosed, please find a(n) **Insurance Renewal Certificate**. Please respond as appropriate. If you should have any questions or would like to discuss this matter further, I may be reached via email at ctslitmanagement@wellsfargo.com. All correspondence can be sent to me at the address below:

    Wells Fargo Bank, N.A.
    Attn: Stephanie Hall
    9062 Old Annapolis Road
    Columbia, MD 21045

Thank you for your prompt attention to this matter.

Yours truly,

Stephanie Hall
Paralegal

Enclosure(s)
cc: file
ID# 1326390609



Together we'll go far

Wells Fargo Bank, N.A.

State Farm General Insurance Company
900 Old River Rd.
Bakersfield, CA 93311-6000

POLICY NUMBER 91-JB-2812-3
Rental Dwelling Pol - Special Form
MAR 01 2012 to MAR 01 2013

BILLED THROUGH SFPP

**Coverages and Limits**

| Section I | | |
|---|---|---|
| A  Dwelling | $1,295,400 |
| Dwelling Extension | 129,540 |
| B  Personal Property | 64,770 |
| C  Loss of Rents | Actual Loss |

**Deductibles - Section I**
Basic                                      2,000

**Section II**

| L  Business Liab (per occurrence) | $300,000 |
| (annual aggregate) | 600,000 |
| M  Medical Payments to Others | 1,000 |
| (each person) | |

**Annual Premium**                        $3,018.00

Inflation Coverage Index:  247.6

AT I            005849  0001        K-02-  6075-F146      R      F
WELLS FARGO BANK, NATIONAL
ASSOCIAITON, AS TRUSTEE
9062 OLD ANNAPOLIS RD
COLUMBIA MD  21045-2479

JAN 10 2012

Insured:  BARONI, JAMES J & ALLANA

Location:  3435 RIO RD
CARMEL CA
93923-9217

SFPP No.  0338354202

Mortgagee:  WELLS FARGO BANK, NATIONAL
ASSOCIAITON, AS TRUSTEE

Loan No: 0017362807

**Forms, Options, and Endorsements**

| Special Form 3 | FP-8103.3 |
| Amendatory Endorsement | FE-8205 |
| Debris Removal Endorsement | FE-8445 |
| Policy Endorsement | FE-8315.2 |
| Building Ordinance or Law 10% | FE-7570 |
| Extra Replacement Cost Cov | FE-8702 |
| Form 438bfu NS Lndr Loss Pay | FE-1313 |
| Amendatory Collapse | FE-8700 |
| Registered Domestic Partnrship | FE-5383 |
| Genl CO Signature Endorsement | FE-5832.1 |
| Mandatory Reportng Endorsement | FE-5801 |

This policy includes Building Code Upgrade Coverage of  $129,540.

Please help us update the data used to determine your premium. Contact your agent with the year each of
your home's utilities (heating/cooling, plumbing, or electrical) and roof were last updated.

*Thanks for letting us serve you*

Moving? See your State Farm agent.
See reverse for important information.
Prepared

**Agent** CHUCK HEWETT  CLU, ChFC
Telephone (831) 372-8006  or  (831) 648-0130

REP                                        JAN 04 2012

EXHIBIT "H"

**From:** "Adam N. Barasch" <anb@severson.com>
**Date:** March 12, 2013, 12:11:23 PM PDT
**To:** 'Mike Riley' <mriley8@aol.com>
**Subject: RE: Baroni Matter Case No1:12-bk-10986-AA**

Dear Mike,

Here are the two links.

http://www.sec.gov/Archives/edgar/data/1288968/000095011604001592/0000950116-04-001592-index.htm

http://www.sec.gov/Archives/edgar/data/1507951/000119312512271103/d365929dex101.htm

Thanks,

Adam N. Barasch
Severson & Werson
One Embarcadero Center, 26th Floor
San Francisco, CA 94111
(415) 677-5533
www.severson.com

-----Original Message-----
From: Mike Riley [mailto:mriley8@aol.com]
Sent: Tuesday, March 12, 2013 12:10 PM
To: Adam N. Barasch
Subject: Fwd: Baroni Matter Case No1:12-bk-10986-AA

Good Morning Adam,

Thank you for forwarding the Nationstar discovery response. We are currently reviewing it
however, we are having difficulty accessing the SEC linked information. If possible please email
me the hyperlinks so we can access the documents.

Thank you.

Warm regards,

Mike Riley



## Filing Detail

EDGAR Home » Search the Next-generation EDGAR System » Company Search » *Current Page*

**Form 8-K** - Current report

**SEC Accession No.** 0000950116-04-001592

| Filing Date | Period of Report | Items |
|---|---|---|
| 2004-05-14 | 2004-04-30 | Item 5: Other events |
| **Accepted** | | Item 7: Financial statements and |
| 2004-05-14 17:05:08 | | exhibits |
| **Documents** | | |
| 7 | | |

### Document Format Files

| Seq | Description | Document | Type | Size |
|---|---|---|---|---|
| 1 | FORM 8-K | eight-k.txt | 8-K | 8159 |
| 2 | EXHIBIT 1.1 | ex1-1.txt | EX-1.1 | 8427 |
| 3 | EXHIBIT 4.1 | ex4-1.txt | EX-4.1 | 538455 |
| 4 | EXHIBIT 99.1 | ex99-1.txt | EX-99.1 | 60289 |
| 5 | EXHIBIT 99.2 | ex99-2.txt | EX-99.2 | 183111 |
| 6 | EXHIBIT 99.3 | ex99-3.txt | EX-99.3 | 22036 |
| 7 | EXHIBIT 99.4 | ex99-4.txt | EX-99.4 | 213980 |
| | Complete submission text file | 0000950116-04-001592.txt | | 1036669 |

**STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRUST 2004-5 (Filer)**
CIK: 0001288968 (see all company filings)

| Business Address | Mailing Address |
|---|---|
| *3 WORLD FINANCIAL CENTER* | *3 WORLD FINANCIAL CENTER* |
| *NEW YORK NY 10285* | *NEW YORK NY 10285* |

EXHIBIT "I"

Recording Requested By:
AURORA BANK FSB

When Recorded Return To:

ASSIGNMENT PREP
AURORA BANK FSB
P.O. Box 1706
Scottsbluff, NE 69363-1706

---

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Monterey, California
REF #:0017362807 "BARONI"

MERS #: 100086600111014900 SIS #: 1-888-679-6377

Prepared By Beverley Rodriguez, AURORA BANK FSB 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69363-1706
308-220-2315

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR PLATINUM CAPITAL GROUP, ITS SUCCESSORS AND/OR ASSIGNS hereby, assigns and transfers to AURORA BANK FSB at 2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361 all beneficial interest under that certain Deed of Trust dated 02/26/2004 , executed by JAMES BARONI, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR PLATINUM CAPITAL GROUP and Recorded  03/04/2004  in Book/Reel/Liber: N/A Page/Folio. N/A as Instrument No  2004019928 in the County of Monterey, State of California.

In witness whereof this instrument is executed.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC  AS NOMINEE FOR PLATINUM CAPITAL GROUP,
ITS SUCCESSORS AND/OR ASSIGNS
On  12-12-11

_____
REGINA LASHLEY, Vice-President

STATE OF NEBRASKA
COUNTY OF Scotts Bluff

ON 12-12-2011, before me, IRENE GUERRERO, a Notary Public in and for the County of Scotts Bluff County, State of Nebraska, personally appeared REGINA LASHLEY, Vice-President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
IRENE GUERRERO
Notary Expires. 09/14/2013

GENERAL NOTARY - State of Nebraska
IRENE GUERRERO
My Comm. Exp. Sept. 14, 2013

(This area for notarial seal)

*BRO*BR1ALSI*12/09/2011 02 28 47 PM* ALSI01ALSIA00000000000000000768271* CAMONTE* 0017362807 CASTATE_ALSI_TRUST_ASSIGN_ASSN **BR1ALSI*

EXHIBIT "J"

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL

MIN: 1000866-0011101490-0      Loan Number: 11101490

# ADJUSTABLE RATE NOTE
### (1 Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

FEBRUARY 26, 2004      IRVINE      CALIFORNIA
    [Date]            [City]            [State]

3435 RIO ROAD, CARMEL, CALIFORNIA 93921
           [Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,430,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is PLATINUM CAPITAL GROUP

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.500 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on MAY 1 2004 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on APRIL 1, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 17101 ARMSTRONG AVENUE SUITE 200, IRVINE, CALIFORNIA 92614

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 8,119.38 . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01        Page 1 of 6

DocMagic eForms 800-649-1362
www.docmagic.com

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial interest rate I will pay may change on the 1st    day of APRIL,    2009                       ,
and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called
a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year
London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S.
dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index
figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable
information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND
250/1000                                percentage points (    2.250    %) to the Current Index. The Note
Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject
to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change
Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate
in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    10.500    % or
less than    2.250    %. Thereafter, my interest rate will never be increased or decreased on any single Change
Date by more than TWO AND 000/1000                                            percentage point(s)
(    2.000    %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will
never be greater than    10.500%.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly
payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment
changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my
monthly payment before the effective date of any change. The notice will include information required by law to be
given to me and also the title and telephone number of a person who will answer any question I may have regarding
the notice.

## 5.    BORROWER'S RIGHT TO PREPAY **See attached Addendum to Note.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only
is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.
I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder
will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder
may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my
Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in
the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial
Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial
Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/0        Page 2 of 6

DocMagic *EForms*  800-649-1362
www.docmagic.com

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be    5.000    % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                                        Page 3 of 6

DocMagic EForms 800-649-1362
www.docmagic.com

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                                     Page 4 of 6

DocMagic *EFarms* 800-649-1362
www.docmagic.com

made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE–1 Year LIBOR Index (Assumable after IP)
Single Family–Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                                                    Page 5 of 6

DocMagic eForms  800-649-1362
www.docmagic.com

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)          _____ (Seal)
JAMES J. BARONI          -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower


*[Sign Original Only]*

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)          DocMagic eForms 800 649-1362
Single Family--Freddie Mac MODIFIED INSTRUMENT                                   www.docmagic.com
Form 3548  1/01                        Page 6 of 6

PAY TO THE ORDER OF

LEHMAN BROTHERS BANK FSB
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY *(signature)*

ASST. SECRETARY

*Carleton Pytron*

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY: *(signature)*

RICK W. SKOGG
VICE PRESIDENT

PAY TO THE ORDER OF

WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.

BY *(signature)*

RALPH A. ORLANDI III
AUTHORIZED SIGNATORY

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: 11101490

Property Address: 3435 RIO ROAD, CARMEL, CALIFORNIA 93921

**THIS ADDENDUM** is made this 26th day of FEBRUARY   2004        , and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to PLATINUM CAPITAL GROUP, A CALIFORNIA CORPORATION
(the Lender).

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this Addendum.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay interest by making payments every month for the first  120   payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues.  I will pay principal and interest by making payments every month thereafter for the next  240   payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the first day of each month beginning on MAY 1, 2004
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal.  If, on APRIL 1, 2034        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 17101 ARMSTRONG AVENUE SUITE 200, IRVINE, CALIFORNIA 92614
, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 6,554.17        .  This payment amount is based on the original principal balance of the Note.  This payment amount may change.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                   percentage point(s) (   2.250  %) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period.  If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.  At the end of the Interest-Only Period and on each Change Date thereafter, the

Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED
### (A)  Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5 . 0 0 0 % of my overdue payment of interest during the Interest-Only Period, 5 . 0 0 0        % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

_____  Feb 27/04 _____
Borrower                            Date        Borrower                            Date
JAMES J. BARONI


_____  _____        _____  _____
Borrower                            Date        Borrower                            Date


_____  _____        _____  _____
Borrower                            Date        Borrower                            Date

Aurora · Loan Services

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

November 04, 2010                                                      VRZ

3640017362807534CS31811-04-10

James Baroni
3339 Via Verde CT
Calabasas CA 91302-3085

RE:  Loan No. 0017362807

Dear Customer(s):

Aurora Loan Services LLC (Aurora Loan Services) received your request
for original loan documents.

Original loan documents are deposited with a document custodian – not
Aurora Loan Services. Requests for custodial documents must be made in
writing and usually accompanied by a subpoena. Original documents are
not generally available to the public. However, to accommodate your
request, we are providing the enclosed certified copy of the original
Note and/or Mortgage.

If you have any questions, please contact one of our Customer Service
Representatives at the address above, by visiting our website,
www.myAuroraLoan.com, or by calling 800-550-0508.

Sincerely,

Virginia Ramirez
Research Specialist
Aurora Loan Services

Aurora Loan Services is a debt collector. Aurora Loan Services is
attempting to collect a debt and any information obtained will be
used for that purpose. However, if you are in bankruptcy or received
a bankruptcy discharge of this debt, this communication is not an
attempt to collect the debt against you personally, but is notice
of a possible enforcement of the lien against the collateral property.



EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

EXHIBIT "K"

MIN: 1000866-0011101490-0                          Loan Number: 11101490

# ADJUSTABLE RATE NOTE
### (1 Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)

1736̅2807

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE
AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE
CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

FEBRUARY 26, 2004          IRVINE               CALIFORNIA
    [Date]                  [City]                [State]
          3435 RIO ROAD, CARMEL, CALIFORNIA 93921
                    [Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 1,430,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is PLATINUM CAPITAL GROUP
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     5.500 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the  1st   day of each month beginning on MAY 1 2004    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on APRIL 1, 2034        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 17101 ARMSTRONG AVENUE SUITE 200, IRVINE, CALIFORNIA 92614
                          or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 8,119.38    . This amount may change.

### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                          Page 1 of 6

DocMagic €Formses 800-649-1362
www.docmagic.com

Us3548.not.1.sem

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial interest rate I will pay may change on the 1st  day of APRIL,  2009           ,
and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called
a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year
London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S.
dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index
figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable
information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND
250/1000                    percentage points (      2.250   %) to the Current Index. The Note
Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject
to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change
Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate
in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than      10.500  % or
less than        2.250   %. Thereafter, my interest rate will never be increased or decreased on any single Change
Date by more than TWO AND  000/1000                         percentage point(s)
(      2.000   %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will
never be greater than     10.500%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly
payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment
changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my
monthly payment before the effective date of any change. The notice will include information required by law to be
given to me and also the title and telephone number of a person who will answer any question I may have regarding
the notice.

## 5.  BORROWER'S RIGHT TO PREPAY **See attached Addendum to Note.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only
is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.
I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder
will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder
may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my
Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in
the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.  My partial
Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial
Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

---

MULTISTATE ADJUSTABLE RATE NOTE 1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                    Page 2 of 6

*DocMagic eForms* 800-649-1362
www.docmagic.com

Us3548.not.2.tem

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                      Page 3 of 6

DocMagic eForms 800-649-1362
www.docmagic.com

Us3548.not 3.tem

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A)   UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B)   AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                     Page 4 of 6

DocMagic *eForms* 800-649-1362
www.docmagic.com

U63548.not 4.tem

made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE NOTE-1 Year LIBOR Index (Assumable after IP)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 3548  1/01                                   Page 5 of 6

DocMagic EZForms  800-649-1362
www.docmagic.com

Us3548.nst.5.tem

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)                    _____ (Seal)
JAMES J. BARONI              -Borrower                                                -Borrower


_____ (Seal)                    _____ (Seal)
                            -Borrower                                                -Borrower


_____ (Seal)                    _____ (Seal)
                            -Borrower                                                -Borrower



*[Sign Original Only]*

PAY TO THE ORDER OF
LEHMAN BROTHERS BANK FSB
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY _____
ASST. SECRETARY

Carleton Pylrion

PAY TO THE ORDER OF
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.

BY _____
RALPH A. LENZI III
AUTHORIZED SIGNATORY

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY _____
RICK W. SKOGG
VICE PRESIDENT

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: 11101490

Property Address: 3435 RIO ROAD, CARMEL, CALIFORNIA 93921

**THIS ADDENDUM** is made this 26th day of FEBRUARY 2004 , and is incorporated into
and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed
by the undersigned and payable to PLATINUM CAPITAL GROUP, A CALIFORNIA
CORPORATION (the Lender).

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the
Note are changed by this Addendum.

## 3. PAYMENTS
**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period")
in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every
month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal
balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly
payments.

I will make my monthly payments on the first day of each month beginning on MAY 1, 2004 .
I will make these payments every month until I have paid all of the principal and interest and any other charges
described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date
and will be applied to interest before principal. If, on APRIL 1, 2034 , I still owe amounts
under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 17101 ARMSTRONG AVENUE SUITE 200, IRVINE,
CALIFORNIA 92614
, or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 6,554.17 . This
payment amount is based on the original principal balance of the Note. This payment amount may change.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND 250/1000 percentage point(s) ( 2.250 %) to the Current
Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth
of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new
interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment
that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier
of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal
during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment
amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest
rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the

Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED
### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5 . 000 % of my overdue payment of interest during the Interest-Only Period, 5 . 000     % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

_____  Feb 27/09    _____
Borrower                                      Date         Borrower                                      Date
JAMES J. BARONI

_____            _____
Borrower                                      Date         Borrower                                      Date

_____            _____
Borrower                                      Date         Borrower                                      Date

INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE PROMISSORY NOTE
FORM 603E  03/03/03
Page 2 of 2

800-649-1362
www.docmagic.com

603e2.sla

# AFFIDAVIT OF AUTHENTICITY

I, _____, being first duly sworn and on oath states:

1.    I am a resident of the State of Colorado.  I am over 18 years of age, and have not been convicted of a felony or a crime involving dishonesty.

2.    I am an employee of Aurora Loan Services LLC, the servicer of the mortgage loan that is the subject of this action  As the servicer, Aurora is the entity responsible for, among other things, receiving any scheduled periodic payments from borrowers pursuant to the terms of the note and mortgage evidencing the mortgage loan at issue in this case, including amounts for any escrow accounts, and for enforcing the terms and conditions of the note and security instrument, for and on behalf of the owner of the loan.

3.    I have personal knowledge of the facts contained in this affidavit by virtue of my position and experience at Aurora, and by virtue of my examination of the document included as exhibit to this affidavit.

6.    A true and correct copy of the note evidencing the loan at issue is attached hereto as Exhibit A.

AFFIANT STATES NOTHING MORE.

[Name]
[Title]
Aurora Loan Services LLC

SUBSCRIBED and SWORN
to before me this ___ day of
January, 2010.

Notary Public
EXP (3/02/2011)

EXHIBIT "L"

Report of Meredith DeKalb Miller
Forensic Document Examiner
August 17, 2011

i

# Table of contents

I. Introduction and Personal Background…………………………………………    p. 3
     a. Relevant professional background…………………………………    p. 3-4
     b. Relevant testimony background…………………………………    p. 4-5

II. Materials relied on……………………………………………………………    p. 4-5

III. Scope of Report………………………………………………………………    p. 5

IV. Basis and Reason for Opinions ………………………….....................    p. 5-7

V. Findings…………………………….....................................................    p. 7-8

Ms. Allana Baroni
3339 Via Verde Court
Calabasas, CA 91302
(+1) 818 222 0303

**RE:    Adjustable Rate Note and Deed of Trust**

Date Specimens Received: Specimens received electronically by email dated May 24, 2011 and
June 29, 2011 and inspected at the offices of McGinnis Tessitore Wutcher LLP, The Loop
Center Building, 105 W. Madison Street, Suite 1800, Chicago, IL 60602 on June 10, 2011.

## I. INTRODUCTION AND PERSONAL BACKGROUND

1. My name is Meredith DeKalb Miller. My business address is 2915 Middle Road,
Davenport, IA 52803 and 4747 North Paulina, Chicago, IL 60640. I am currently a forensic
document examiner in private practice, and I am also a forensic document instructor, contracted
with the U.S. Department of Justice, International Criminal Investigative Training Assistance
Program (ICITAP). A copy of my CV is attached as Exhibit 1 of this report.

2. I have received a Bachelor of Arts degree in Social Sciences from Colorado State
University, Fort Collins, Colorado in 1992 and a Master of Forensic Sciences degree from the
George Washington University, Washington, D.C. in 1998.

### A.    Relevant Professional Background

3. From April 1998 through March 2001, I received Federal Bureau of
Investigation (FBI) training in the area of questioned document examinations, which included
handwriting, typewriting and printing examination specific training—i.e. reading relevant
articles and textbooks in the field, passing practical tests, oral boards, moot courts, and working
over two hundred cases under the guidance of a senior questioned document examiner.

4. From March 2001 through July 2006, I was a forensic document examiner with
the Questioned Documents Unit of the FBI in Quantico, Virginia. My duties and responsibilities
included performing forensic examinations of documentary evidence and testifying in federal
and state court to my findings.

5. During my training and employment as a forensic document examiner with the
FBI, I reviewed hundreds of documents to determine authenticity of the questioned specimens
compared to known specimens. As a result, I prepared over 300 reports based upon my findings
with regard to the questioned documents I reviewed. As per Laboratory policy, my casework
was peer reviewed.

6. From September 2004 through May 2006, I was an adjunct professorial
lecturer at The George Washington University, where I instructed graduate students in a class
entitled Questioned Documents which included instruction on handwriting comparison and
identification.

7. Since August 2006 I have been a contracted document examiner instructor for the U.S. Department of Justice, International Criminal Investigative Training Assistance Program (ICITAP). My duties and responsibilities include teaching questioned document courses throughout the developing world. Through ICITAP, I have developed and provided instruction in handwriting examinations in Kosovo, Mozambique and Paraguay.

8. Since going into private practice in 2006, I have been retained as an expert approximately fifty times to conduct document examinations and provide an opinion. My typical engagements include being retained by a party to a lawsuit to render an opinion on handwriting.

**B.    Relevant Testimony**

9. I have been accepted as a handwriting expert and testified ten times in the following courts:

i. U.S. v. Martinez, No. 01-CR-00098 (M.D. Fla. Filed June 20, 2001) (testified October 16, 2001)

ii. U.S. v. Badia, No. 02-CR-00036 (N.D. Fla. Filed June 4, 2002) (testified October 16, 2002)

iii. U.S. v. Miller, No. 04-CR-00382 (E.D. Pa. Filed June 30, 2004) (testified November 17, 2004 and May 19, 2005)

iv. Commonwealth v. Anthony DiBenedetto, No. 04-CR-00053 (Superior Ct. of Mass., Middlesex County Filed January 20, 2004) (testified April 12, 2005)

v. State v. John Allen Muhammad, No. 102676C (Cir. Ct., Montgomery County, MD. Filed June 16, 2005) (testified May 18, 2006)

vi. Bahrani v. Conagra, Inc. et al., No. 00-CV-01077 (D. Colo. Filed May 25, 2000) (testified March 11-12, 2009)

vii. In re Estate of Jastrowski, No. 08-P-000159 (Cir. Ct., Cook County, Ill. Filed January 9, 2008) (testified May 5, 2009)

viii. Yellow Book v. Bob's Refrigeration, Inc., No. 07-MI-254497 (Cir. Ct., Cook County, Ill.) (testified March 30, 2010)

ix. Fraudulent Transfer of U.S. 1,171,751 from the Central Bank of Liberia (CBL) to the Ecobank Liberia limited., Temple of Justice, Monrovia, Liberia (testified June 15, 2010)

x. Michael McGrath v. Northern Heritage Builders, LLC et al, No. 07-L-8252 (Cir. Ct. Cook County, Ill) (testified February 16, 2010)

## II.    MATERIALS RELIED UPON

10. In preparing this opinion, I have relied upon specimens submitted to me for

examination. My opinions are based on my education, teaching, training, experience, and the materials I reviewed.

**The following specimens were received electronically on May 24, 2011:**

Qc1      Copy of an Adjustable Rate Note for Loan Number: 11101490 dated February 26, 2004

Qc2      Copy of an Adjustable Rate Note for Loan Number: 11101490 dated February 26, 2004

Qc3      Copy of an Adjustable Rate Note for Loan Number: 11101490 dated February 26, 2004 bearing the text "Certified To Be A True And Correct Copy Of The Original"

**The following specimens were examined at the offices of McGinnis Tessitore Wutcher LLP, The Loop Center Building, 105 W. Madison Street, Suite 1800, Chicago, IL 60602 on June 10, 2011:**

Q4      Deed of Trust dated February 26, 2004 in the borrowers name of James J. Baroni

Q5      Adjustable Rate Note for Loan Number: 11101490 dated February 26, 2004

**The following specimen was received electronically on June 29, 2011:**

Qc6      Copy of an Adjustable Rate Note for Loan Number 11101490 dated February 26, 2004 received from Aurora Loan Services

## III. SCOPE OF REPORT

11. I have been retained by Ms. Allana Baroni to analyze and compare the questioned specimens designated Qc1 through Qc6 for possible alterations/changes to the documents. Ms. Baroni emailed me a copy of four specimens designated Qc1 through Qc3, and Qc6; and I reviewed two original specimens designated Q4 and Q5 in the law offices of McGinnis Tessitore Wutcher LLP in Chicago, Illinois on June 10, 2011.

12. To reach my opinion, I conducted a visual and microscopic examination of the questioned specimens following the guidelines established by the American Society of Testing and Materials (ASTM) Standard Guide for the Examination of Altered Documents. This Guide provides the procedures for examinations that should be used by forensic document examiners for examinations involving altered documents.

## IV. BASIS AND REASON FOR OPINIONS

15. The methodology used for conducting an examination for an alteration follows the ASTM Standard Guide for Examination of Altered Documents and my prior training at the

Federal Bureau of Investigation (FBI) Laboratory. The procedures outlined in the ASTM guide are grounded in the generally accepted body of knowledge and experience in the field of questioned document examination. This process includes the examination of the documents for the presence of characteristics indicative of alterations.

16. At various points in these procedures, a determination that a particular feature is not present or that an item is lacking in quality or comparability may indicate that the examiner should discontinue or limit the procedure(s). Limitations can be due to the submission of non-original documents, limited comparability, or condition of the items submitted for examination (for example, items that are stained, soiled, water-damaged, charred, or shredded).

17. **Analysis**: Each analysis begins by examining the questioned and known specimens using proper lighting and magnification. Appropriate lighting and sufficient magnification allows fine details to be distinguished. Other equipment may be used as required: infrared image conversion device or system with appropriate light sources and filters for use in infrared and infrared luminescence examinations, ultraviolet light, imaging equipment for recording observations, measuring devices, an electrostatic detection device, and other equipment as appropriate. Non-destructive procedures shall be performed when applicable.

18. Some of the features to be considered for the examination of alterations can include, but are not limited to, the following: overwriting, characteristics of multiple writing instruments, crowded or awkward placement of writing and/or printed text, paper fiber disturbance, use of different fonts, sizes, and/or styles, areas of discoloration, presence of an obscuring substance, smearing, uneven margins, different printing processes, irregular spacing and alignment, both vertical and horizontal, differences in fastening and binding marks, inconsistent handwriting features, unusual sequence of line intersections contrary to what may be claimed and variations in paper characteristics.

19. **Comparison:** In conducting the examination for alterations, the Qc1 through Qc6 specimens were compared to each other. The Qc1 through Qc3, and Qc6 specimens were submitted for analysis via email and contain four Adjustable Rate Notes. The Q4 and Q5 specimens were a Deed of Trust and an Adjustable Rate Note examined at the law offices of McGinnis Tessitore Wutcher LLP in Chicago, Illinois.

20. The Q4 specimen was a Deed of Trust compared to the Qc1 through Qc3, Q5 and Qc6 specimens which are Adjustable Rate Notes with loan number 11101 490. The Qc1 through Qc3, Q5 and Qc6 specimens are all representative copies of the same Adjustable Rate Note. However, several similarities and differences were observed between the specimens.

21. The hand printed word "Kahrl" and the number "17362807" were observed on the upper right hand side of the Qc1 and Q5 specimens. This notation was not observed on the Qc2, Qc3, or the Qc6 specimens.

22. Indications of two holes/fastener marks were observed at the top of the Qc1, Qc2, Q5, and Qc6 specimens. However, due to the copy process, the fastener marks cannot be observed on

all pages of the Qc2 and/or Qc6 specimens. No evidence of the two holes/fastener marks is observed on the Qc3 specimen.

23. A stamp is observed on the Qc3 specimen reading "Certified to be a True and Correct Copy of the Original". This stamp is not observed on the Qc1, Qc2, Q5, and Qc6 specimens.

24. The text, font style, and signatures are consistent between the Qc1, Qc2, Qc3, Q5, and Qc6 specimens; however, the size of the font on the Qc2 specimen is smaller than the remaining questioned specimens.

25. The Qc2 and Qc6 specimen has a form number that does not appear in the Qc1, Qc3 and Q5 specimens which could explain the smaller size font that is observed. A handwritten number "17362807" appears on the first page of the Qc2 and Qc6 specimens. A copy trash mark appears on every page of the Qc2 and Qc6 specimens.

26. The signatures of "James J. Baroni" are consistent on page 6 of 6 and page 2 of 2 of the Qc1, Qc2, Qc3, Q5 and Qc6 specimens.

27. The endorsement signatures on the endorsement page of Qc2 and Qc6 specimens are configured differently than the Qc1, Qc3 and Q5 endorsement signatures.

28. Three endorsement signatures were observed on the Qc1, Qc3 and Q5 specimens. The placement of the endorsement signatures on Qc1, Qc3, and Q5 appear similar however, the signatures are not aligned with each other. (I.e. when any one endorsement signature is aligned with the same endorsement signature on the Qc1, Qc3 and Q5 specimen, the other two endorsement signatures fall out of alignment.) This could be due to intercomparing various generations of copies. This was observed with transmitted light using the Video Spectral Comparator 4.

29. **Evaluation:** After determining differences and similarities between the questioned specimens, the characteristics are evaluated individually and in combination. An opinion is formed based on the results of the above analyses, comparisons, and evaluations. This evaluation is based on training, knowledge, and experience of the examiner.

30. It is purported that the Qc1, Qc2, Qc3 and Qc6 specimens are representative copies of the original specimen, Q5, of an Adjustable Rate Note, loan number 11101490, bearing the name James J. Baroni. As such, the Qc1, Qc2, Qc3, Q5, and Qc6 specimens were intercompared for similarities and differences.

31. The Q4 specimen is a Deed of Trust and was not intercompared to the Qc1, Qc2, Qc3, Q5, and Qc6 specimens because it is a different document.

## V. FINDINGS

32. Hole punches were observed on the Qc1, Qc2, Q5, and Qc6 specimens. Due to the lack of clarity of the Qc3 copy, no determination could be reached whether or not hole punches

were on the Qc3 specimen. No hole punches were observed on the Q4 specimen.

33. Similarities in handwritten notations (i.e. 17362807 Kahrl) were observed on the first page of the Qc1 and Q5 specimens.  This handwritten notation was not observed on the Qc2, Qc3 and/or the Qc6 specimen.

34. A stamp impression reading "Certified to be a true and correct copy of the original" is observed on the first page of the Qc3 specimen. This stamp impression is not observed on the Qc1, Qc2, Q5, and/or Qc6 specimens.

35. The font style, text  and "James J. Baroni" signatures are consistent between the Qc1, Qc2, Qc3,  Q5, and Qc6 specimens. However, the font size of the Qc2 and Qc6 specimens are smaller.

36. The endorsement signatures on the endorsement page of Qc2 and Qc6 are configured differently than the Qc1, Qc3 and Q5 endorsement signatures.

37. Digital images of the Qc1 through Qc6 specimens have been retained.

Meredith DeKalb Miller
Forensic Document Examiner

# Exhibit 1 Curriculum Vitae

Meredith DeKalb Miller
Forensic Document Examiner
(312) 343-9902

Iowa:
2915 Middle Road
Davenport, IA 52803

Illinois:
4747 North Paulina
Chicago, IL 60640

## PROFESSIONAL EXPERIENCE

August 2006-present
**Forensic Document Examiner/Consultant/Expert Witness**
Private Practice
Chicago, IL and Davenport, IA

Perform forensic examinations on handwriting, signatures, typewriting, printing, and other documentary evidence to establish origin or authenticity. Provide expert testimony in federal, state, and local courts, when necessary. Present training/consulting in the field of questioned documents.

August 2006-present
**International Instructor**
International Criminal Investigative Training Assistance Program
U.S. Department of Justice
Washington, D.C.

*Maputo, Mozambique*
Developed and provided instruction in questioned document fundamentals including handwriting   examinations, forgeries, counterfeits, and security printing to include formalized lectures, practical problems, and a written test. Offered recommendations for purchasing scientific equipment.

*Dar Es Salaam, Tanzania*
Developed and provided instruction in the area of typewriting examinations to include formalized lectures, practical problems, and written tests. Reviewed and offered recommendations for continued improvement in equipment and continuing education.

*Prishtina, Kosovo*
Developed and provided instruction in the area of handwriting examinations to include formalized lectures, practical problems, written tests, and handwriting cases. Reviewed and offered recommendations for continued improvement in case management, standard operating procedures, equipment, and continuing education.

September 2009 -
March 2010
**Lead Consultant**
United Nations Office on Drugs and Crime
Vienna, Austria

Developed a Model Forensic Document Laboratory Guide designed to enhance forensic document examination and intelligence dissemination capabilities between donor and recipient countries. Increase detection of fraudulent travel and identity documents by recommending equipment, personnel, training, expertise and communications.

March 2001 – July 2006        **Forensic Document Examiner**
                              Questioned Documents Unit
                              Federal Bureau of Investigation
                              Quantico, VA

Performed forensic examinations on handwriting, typewriting, printing, and other documentary evidence submitted to the FBI Laboratory establishing origin or authenticity. Provided expert testimony in federal, state, and local courts, when necessary. Presented training and expertise at local, national, and international conferences.

April 1998 - March 2001       **Document Analyst/Examiner Trainee**
                              Questioned Documents Unit
                              Federal Bureau of Investigation
                              Washington, D.C.

Prepared laboratory worksheets, photographed evidence, and conducted indented writing examinations. Completed a full-time training program consisting of formalized lectures, reading numerous books and articles in the field of questioned documents, and successfully completed a series of practical problems, written examinations, oral boards, moot courts, and over 200 cases under the supervision of a qualified document examiner.

Sept. 2004 – May 2006         **Adjunct Professorial Lecturer**
                              The George Washington University
                              Washington, D.C.

Developed and instructed a graduate level course in Questioned Documents to include laboratory exercises, lectures, tours, special projects, and testing. Encouraged and identified professional and scholarship opportunities through frequent communication with law enforcement agencies.

EDUCATION

Jan. 1996 – Jan. 1998         **Master of Forensic Sciences**
The George Washington University
Washington, D.C.

Aug. 1988 – Dec. 1992         **Bachelor of Arts in Social Sciences**
Colorado State University
Fort Collins, CO

TESTIMONY EXPERIENCE

Rendered opinions in federal and state courts ten times:

U.S. v. Martinez, No. 01-CR-00098 (M.D. Fla. Filed June 20, 2001) (testified October 16, 2001)

U.S. v. Badia, No. 02-CR-00036 (N.D. Fla. Filed June 4, 2002) (testified October 16, 2002)

U.S. v. Miller, No. 04-CR-00382 (E.D. Pa. Filed June 30, 2004) (testified November 17, 2004 and May 19, 2005)

Commonwealth v. Anthony DiBenedetto, No. 04-CR-00053 Superior Ct. of Mass., Middlesex County Filed January 20, 2004)
(testified April 12, 2005)

State v. John Allen Muhammad, No. 102676C (Cir. Ct., Montgomery County, MD., Filed June 16, 2005) (testified May 18, 2006)

Bahrani v. Conagra, Inc. et al., No. 00-CV-01077 (D. Colo. Filed May 25, 2000) (testified March 11-12, 2009)

In re Estate of Jastrowski, No. 08-P-000159 (Cir. Ct., Cook County, Ill. Filed January 9, 2008) (testified May 5, 2009)

Yellow Book v. Bob's Refrigeration, Inc. No. 07-MI-254497 (Cir. Ct, Cook County, Ill.) (testified March 30, 2010)

Fraudulent Transfer of U.S. 1,171,751 from the Central Bank of Liberia (CBL) to the Ecobank Liberia limited., Temple of Justice, Monrovia, Liberia (testified June 15, 2010)

Michael McGrath v. Northern Heritage Builders, LLC et al, No. 07-L-8252 (Cir. Ct. Cook County, Ill) (testified February 16, 2010)

PROFESSIONAL AFFILIATIONS

*Member*, Questioned Documents Section, American Academy of Forensic Sciences
*Secretary*, American Society for Testing and Materials
*International Assessor*, American Society of Crime Laboratory Directors
*Technical Assessor*, Forensic Quality Services, Inc.

PRESENTATIONS

| February 2011 | *Guide for the Development of Forensic Document Examination Capacity*, American Academy of Forensic Sciences Annual Meeting, Chicago, IL |
| April 2006 | Instructor, *Handwriting Fundamentals*, National Academy, Quantico, VA |
| February 2006 | *Questioned Documents in Health Care Fraud*, National Advocacy Center, Columbia, SC |
| January 2006 | *Role of Questioned Document Examiner in Improvised Nuclear Devices*, Fort Belvoir, VA |
| July 2005 | *An International Overview of Questioned Documents*, Padua and Rome, Italy |

Allana Baroni

| May 2005 | *How Secure Are Social Security Cards?* , Mid-Atlantic Association of Forensic Scientists Annual Meeting, Pittsburgh, PA |
|---|---|
| February 2005 | *Cautionary Statements on Plastic Bags*, American Academy of Forensic Sciences Annual Meeting, New Orleans, LA |
| August 2004 | *Questioned Documents,* Symposium of Forensic Toxicologists Meeting, Washington D.C. |
| May 2004 | *Counterfeit Documents*, Identity Conference hosted by Booz, Allen, and Hamilton, McLean, VA |
| April 2004 | *Questioned Documents,* Language Services Division of FBI Headquarters, Washington, D.C. |
| April 2004 | *Disposable Plastic Film Products*, Mid-Atlantic Association of Forensic Scientists Annual Meeting, Wilmington, DE |
| Feb. 2004 | *Twentieth Century Document Examinations*, American Academy of Forensic Sciences Annual Meeting, Dallas, TX |
| Oct. 2003 | *Counterfeit Document Cases,* Association of Certified Fraud Examiners, Mobile, AL |
| May 2003 | *The Faces of Ink Jet*, Mid-Atlantic Association of Forensic Scientists Annual Meeting, Annapolis, MD |
| Feb. 2003 | *The Faces of Ink Jet*, American Academy of Forensic Sciences Annual Meeting, Chicago, IL |
| Feb. 2002 | *Forensic Examinations and Comparison of Dryer Sheets*, American Academy of Forensic Sciences Annual Meeting, Atlanta, GA |
| Aug. 2001 | *The Forensic Application of Undu® Adhesive Remover*, American Society of Questioned Document Examiners, Des Moines, IA |

Allana Baroni

# Exhibit 2
# Differences noted on the
# First Page of Adjustable Rate Note

## Adjustable Rate Note of Qc1



**ADJUSTABLE RATE NOTE**
(1 Year LIBOR Index - Rate Caps)
(Assumable after Initial Period)

## Adjustable Rate Note of Qc2

MIN: 1000866-0011101490-0                 Loan Number: 11101490

**ADJUSTABLE RATE NOTE**
(1 Year LIBOR Index - Rate Caps)
(Assumable after Initial Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE
AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE
CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

# Exhibit 2
# First Page of Adjustable Rate Note, cont'd

## Adjustable Rate Note of Qc3



**ADJUSTABLE RATE NOTE**
(1 Year LIBOR Index - Rate Caps)
(Assumable after Initial Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE
AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE
CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

## Adjustable Rate Note of Q5



ADJUSTABLE RATE NOTE
(1 Year LIBOR Index - Rate Caps)
(Assumable after Initial Period)

---

# Exhibit 2
# First Page of Adjustable Rate Note, cont'd

Adjustable Rate Note of Qc6

MIN: 1000866-0011101490-0                    Loan Number: 11101490

**ADJUSTABLE RATE NOTE**
(1 Year LiBOR Index - Rate Caps)
(Assumable after Initial Period)

17362807

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE
AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE

Allana Baroni

# Exhibit 2
# Differences noted on the
# Endorsement Page of Qc1-Qc3, and Q5

Placement of endorsements of Qc1

PAY TO THE ORDER OF

PLATINUM CAPITAL GROUP,
A CALIFORNIA CORPORATION

ASST. SECRETARY

PAY TO THE ORDER OF

WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.

BY:
AUTHORIZED

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY:
RICK W. SKOGG
VICE PRESIDENT

Allana Baroni

Placement of endorsements of Qu2

PAY TO THE ORDER OF

WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY

ASST SECRETARY

PAY TO THE ORDER OF

WITHOUT RECOURSE
BROTHERS HOLDINGS, INC.

RALPH A.
HORIZED SIGNATORY

PAY TO THE ORDER OF
BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
MAN BROTHERS BANK, FSB

RICK W. SKOGG
VICE PRESIDENT

Placement of endorsements of Q=2

PAY TO THE ORDER OF

LEHMAN BROTHERS BANK FSB
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY _____
ASST. SECRETARY

PAY TO THE ORDER OF

WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.

BY _____
AUTHORIZED SIGNATORY

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK FSB

BY _____
RICK W. SKOGG
VICE PRESIDENT

Allana Baroni

Page 19

Placement of endorsements of Q5

PAY TO THE ORDER OF
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY:
ASST. SECRETARY

PAY TO THE ORDER OF
LEHMAN BROTHERS HOLDINGS, INC.
WITHOUT RECOURSE
LEHMAN BROTHERS BANK, FSB

BY:
RICK W. SKOGG
VICE PRESIDENT

PAY TO THE ORDER OF
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS, INC.

BY:
RAUL A. LANZ III
AUTHORIZED SIGNATORY

Allana Baroni

EXHIBIT "M

Loan Number: 11101490

# PURCHASE INSTRUCTION AGREEMENT
# FOR CLOSING AGENT

This agreement is entered into by and between Twickenham Capital Corporation, LLC, also known as TCC, as ("Purchaser") and ESCROWS FOR YOU

as ("Closing Agent") this 26th day FEBRUARY   2004

## RECITALS

A.    Purchase Buys Loans for the purchase or refinance of real estate to be secured by Mortgage/Deeds of Trust ("Mortgages") constituting first or second liens on the subject property ("Loans"), which Loans have been originated by Platinum Capital Group ("Originator").

B.    Closing Agent closes the Loans, disburses Loan Buys and delivers and records closing documents pursuant to written instructions. Closing Agent holds funds in trust for Purchaser pending the Loan closing, proper disbursement of Loan proceeds and proper delivery of closing documents. In the event a Loan closing does not occur, Loan proceeds must be immediately wired back to Purchaser and/or its custodian.

NOW, THEREFORE, in consideration of the benefits accruing to Closing Agent hereunder, and as inducement to Purchaser to buy the Loans, Closing Agent agrees as follows:

1)    Closing Agent shall close all of the Loans in compliance with applicable laws and regulations.

2)    For all Loan closings that are purchased by Purchaser, Closing Agent shall deliver all loan documents back to the Originator in a timely manner.

Closing Agent shall hold the Initial Loan Documents, until delivered as set forth above, in trust for Purchaser.

3)    Any instructions given by the Originator, which contradict the provisions of Paragraph 2, shall be disregarded unless the prior written consent of the Purchaser is obtained.

4)    This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed under the laws of the State of New York. This Agreement shall insure to the benefit of and be binding on the respective successors and assignors of the parties hereto.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first above written.

PURCHASER:                                          CLOSING AGENT

Twickenham Capital Corporation, LLC                 ESCROWS FOR YOU _____

By: _____                 By: _____

Its: _____                Its: _____

Pcgpis.msc

FORM B104 (08/07)                                          2007 USBC, Central District of California

RECEIVED

**ADVERSARY PROCEEDING COVER SHEET**                    **ADVERSARY PROCEEDING NUMBER**
(Instructions on Page 2)                                 (Court Use Only)

APR 3 2013

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

| PLAINTIFFS | DEFENDANTS |
|---|---|
| ALLANA BARONI | NATIONSTAR MORTGAGE, LLC |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Michael S. Riley (Admitted Pro Hac Vice) 242 Algiers Avenue, Fort Lauderdale, Florida 33308 Michael S. Riley Tel: (954) 401-3757 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor   ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor   ☐ Other ☐ Trustee | ☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin ☒ Creditor   ☐ Other ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

FORM B104 (08/07), page 2                                          2007 USBC, Central District of California

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | | BANKRUPTCY CASE NO. |
|---|---|---|
| ALLANA BARONI | | 1:12-bk-10986-A |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| CENTRAL DISTRICT | SAN FERNANDO VALLEY | ALAN M. AHART |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
| | MICHAEL S. RILEY |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.