1  MARY KATE SULLIVAN (State Bar No. 180203)
   ADAM N. BARASCH (State Bar No. 158220)
2  BERNARD J. KORNBERG (State Bar No. 252006)
   ANDREW W. NOBLE (State Bar No. 245993)
3  SEVERSON & WERSON
   A Professional Corporation
4  One Embarcadero Center, Suite 2600
   San Francisco, California 94111
5  Telephone: (415) 398-3344
   Facsimile: (415) 956-0439
6  anb@severson.com

7  Attorneys for Creditor
   NATIONSTAR MORTGAGE LLC

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11             SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| 12  ALLANA BARONI, | Case No. 1:12-bk-10986-MB |
| 13              Debtor. | Chapter 11 |
| 14  ———————————————— | Adv No.  1:13-ap-01069-MB |
| 15  ALLANA BARONI, | **NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF** |
| 16              Plaintiff, | |
| 17       vs. | Date:    October 22, 2018 |
| 18  NATIONSTAR MORTGAGE LLC, | Time:    10:00 a.m. |
| 19              Defendant. | |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS ............................................................................... 2

    A.   The Baroni Loan ................................................................................... 2

    B.   Nationstar Possesses the Indorsed Note ............................................... 3

    C.   The Assignment of Title to the Baroni Loan ........................................ 4

        1.   The Initial Sale of the Note to the SARM 2004-5 Trust ............... 4

        2.   The Post-Remand Sale of the Note to the NRZ Pass-Through
             Trust X ........................................................................................... 5

III. PROCEDURAL HISTORY .............................................................................. 7

IV.  NATIONSTAR MAY ENFORCE THE NOTE ............................................... 9

    A.   Standing to Enforce a Secured Promissory Note .................................. 9

    B.   Nationstar Is the "Holder" of the Note ................................................ 9

        1.   Nationstar Is the Bearer of an Indorsed Note ............................... 9

        2.   Baroni Has Not Rebutted the Validity of the Signatures ............. 11

        3.   The Note Was Properly Indorsed During Securitization ............. 14

        4.   The Photocopied Note Is Easily Explained Without Fraud or
             Forgery ........................................................................................ 16

             (a)   Aurora's Role in the Sale and Securitization of Loans ......... 16

             (b)   The Note Was Properly indorsed ....................................... 17

             (c)   The Unindorsed Copy Was Then Accidently indorsed .......... 18

    C.   Nationstar is the "Transferee" of the Note ......................................... 20

        1.   The Delivery of the Note to Nationstar Was Given With Intent to
             Enforce it in this Proceeding ....................................................... 21

        2.   The Sale of the Note to the SARMS 2004-5 Trust Is Evidence that
             the Note Was Delivered With Intent to Enforce ......................... 22

        3.   The Subsequent Sale of the Loan Is Irrelevant as Possession Was
             Not Transferred ........................................................................... 25

        4.   Nationstar Proved It Also Serviced the Loan Post-Sale ............... 28

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

D.     Baroni's Other Causes of Action Fail ..................................................................... 29

V.     CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Aguilera v. Pirelli Armstrong Tire Corp.*,
    223 F.3d 1010 (9th Cir. 2000).................................................................................27

*In re Allen*,
    472 B.R. 559 (9th Cir. BAP 2012) ...........................................................................9

*Anderson v. Burson*,
    424 Md. 232 (2011)...............................................................................2, 20, 21

*Bank of New York v. Raftogianis*,
    418 N.J. Super. 323 (Ch. Div. 2010)........................................................................21

*In re Baroni*,
    2015 WL 6956664 (B.A.P. 9th Cir. Nov. 10, 2015) ....................................... *passim*

*In re Bass*,
    366 N.C. 464 (2013)...........................................................................12, 13

*In re Dudley*,
    502 B.R. 259 (Bankr. W.D. Va. 2013) ...................................................................26

*Fed. Deposit Ins. Corp. v. Ashmore*,
    698 F. App'x 286 (6th Cir. 2017) .....................................................................21, 22

*Fugelsang v. Fugelsang*,
    131 A.D.2d 810 (1987) ...........................................................................27

*Inline, Inc. v. Apace Moving Systems, Inc.*,
    125 Cal.App.4th 895 (2005).....................................................................30

*J.E. Robert Co. v. Signature Properties, LLC*,
    309 Conn. 307 (2013)...........................................................................22

*MSR Expl., Ltd. v. Meridian Oil, Inc.*,
    74 F.3d 910 (9th Cir. 1996)....................................................................30

*Otworth v. Southern Pac. Transportation Co.*,
    166 Cal.App.3d 452 (1985).....................................................................29

*Peterson v. Cellco Partnership*,
    164 Cal.App.4th 1583 (2008)..................................................................29

*In re Phillips*,
    491 B.R. 255 (Bankr. D. Nev. 2013).........................................................12

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

*Prakashpalan v. Engstrom, Lipscomb and Lack*,
    223 Cal.App.4th 1105 (2014) ........................................................................29

*In re Stanley*,
    514 B.R. 27 (Bankr. D. Nev. 2012) ................................................................13

*Tourgeman v. Nelson & Kennard*,
    900 F.3d 1105 (9th Cir. 2018) .......................................................................29

*Valley Bank of Nevada v. JER Mgmt. Corp.*,
    149 Ariz. 415 (Ct. App. 1986) .......................................................................13

*In re Veal*,
    450 B.R. 897 (9th Cir. BAP 2011) ................................................9, 20, 22, 26

*Wolfe v. State Farm Fire & Casualty Ins. Co.*,
    46 Cal. App. 4th 554 (1996) ..........................................................................29

*Zetwick v. Cty. of Yolo*,
    850 F.3d 436 (9th Cir. 2017) .........................................................................13

STATUTES

United States Code
    Title 15, § 1692 *et seq.* ...................................................................................7

Cal. Civil Code
    § 1689 .............................................................................................................27

Cal. Commercial Code
    § 1201 cmt. 37 ...............................................................................................12
    § 1201 ............................................................................................................1, 9
    § 1206 .............................................................................................................12
    § 3201 .............................................................................................................20
    § 3203 ...................................................................................................2, 20, 27
    § 3204 ...............................................................................................................9
    § 3204, cmt. 1 ................................................................................................10
    § 3301 ................................................................................1, 2, 9, 11, 20
    § 3308 cmt. 1 .................................................................................................12
    § 3308 .................................................................................1, 10, 11, 12

Cal. Business and Professions Code
    § 17200 .................................................................................7, 8, 29, 30

**OTHER AUTHORITIES**

Official Comment 1 to U.C.C. § 3-203 .......................................................................26, 27

UCC § 3-301 ...........................................................................................................................8

5 Hawkland, Uniform Commercial Code, § 3 (2018) .........................................................9

5 Hawkland, Uniform Commercial Code, § 3-203:2 .......................................................21

5 Hawkland, Uniform Commercial Code, § 3-308:2 .......................................................12

# I. INTRODUCTION

Nationstar Mortgage LLC ("Nationstar") filed Claim 9-1 to enforce an adjustable rate note (the "Note") from James Baroni secured by a deed of trust (the "Deed of Trust") encumbering property now owned jointly by Mr. Baroni and the debtor, Allana Baroni.  Ms. Baroni initiated this adversary proceeding contesting Nationstar's authority to bring the claim.

Nationstar is entitled to enforce the claim because it possesses the original wet-ink Note. The California Commercial Code provides two alternative ways in which possession makes Nationstar a "person entitled to enforce" the Note.  Cal. Comm. Code § 3301.  First, Nationstar is the "holder" of the Note because it is indorsed to blank, making it bearer paper that is enforceable by whomever holds it.  Cal. Comm. Code § 1201(b)(21)(A).  The three indorsements, including the final indorsement in blank, are affixed on the reverse page of Mr. Baroni's signature.  A signature "is presumed to be authentic and authorized."  Cal. Comm. Code § 3308(a).  Therefore, without anything more, the Note is enforceable as a bearer instrument.

Ms. Baroni argues that the presumption is overcome because a copy of the Note exists which contains a different indorsement configuration, though has same order of indorsements by the same signers.  This is not the case.  As the Bankruptcy Appellate Panel ("BAP") ruled, this copy of the Note would only defeat the presumption of validity if it provided evidence that the indorsement page in the original Note was created by unauthorized parties after the sale of the note.  The record on summary judgment did not show whether Nationstar was in possession of a wet-ink note or if the signatures were affixed on the note or on an unattached signature page. Thus the existence of two identical copies of the Note, each with a slightly different indorsement page, could create an inference that an unauthorized party had added indorsement pages at a later time to allow that party to enforce the Note.

At trial, Nationstar demonstrated not only that the indorsement are on the wet-ink Note itself, but that those indorsements were placed there at or near the time the loan was sold on the secondary market.  Finally, the existence of the second indorsement page is not evidence of fraud or forgery, but instead, arose out of the accidental indorsement of a copy of the Note during the securitization process.  A second indorsement on a copy has no legal effect on the validity of the

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

1  indorsement on the original note.  Ms. Baroni presented no evidence to the contrary and has not

2  defeated the presumption of validity that the Note is a bearer instrument.

3      But even if the Court were to disregard the indorsement, Nationstar is still a person entitled

4  to enforce as a "nonholder in possession of the [note] who has the rights of a holder."  Cal. Comm.

5  Code § 3301(ii).  Under this standard, a nonholder may enforce a note so long as the note was

6  "delivered by a person other than its issuer for the purpose of giving to [Nationstar] the right to

7  enforce" the Note.  Cal. Comm. Code § 3203(a).  This standard does not require the Court to dive

8  into the subjective intent of the parties regarding each physical transfer of possession of the note.

9  Instead, the Court must simply decide whether the transfer was intentional, in which the transferee

10  assumes all rights of the transferor, or if the transfer was done by "by theft or accident," in which

11  case the transferee may not enforce the note.  *Anderson v. Burson*, 424 Md. 232, 248 (2011).

12      Nationstar showed that it was delivered the Note for the purpose of enforcing it in Ms.

13  Baroni's bankruptcy case in the regular course of servicing this loan.  Further, Nationstar showed

14  that when it took possession of the Note, it did so as servicer for the owner of the Note.  Finally,

15  Nationstar showed that while the Baroni loan was subsequently sold to another trust, possession of

16  the Note has not changed since the sale.  Therefore, the weight of the evidence shows, by far more

17  than the necessary preponderance of the evidence, that Nationstar is in possession of the Note and

18  that the delivery of the Note to Nationstar was not by theft or mistake.  So, even if the indorsement

19  to blank were disregarded, Nationstar still had the right to enforce the Note and file Claim 9-1.

## II.  STATEMENT OF FACTS

20

21  **A.      The Baroni Loan**

22      The Note dated February 26, 2004, in the amount of $1,430,000.00, is payable to Platinum

23  Capital Group ("Platinum Capital") and bears the signature of James R. Baroni.  Trial Ex. 1a.  The

24  Note is secured by the Deed of Trust encumbering Mr. Baroni's property located at 3435 Rio

25  Road, Carmel, CA 93921 (the "Property").  Trial Ex. 2a.  Ms. Baroni claims that she subsequently

26  obtained an interest in the Property that provided her standing to treat the Note and Deed of Trust

27  in her Chapter 11 plan and bring this objection to claim.

28

**B.      Nationstar Possesses the Indorsed Note**

Nationstar is the current servicer of the Baroni loan and has been since July 1, 2013.  Trial Ex. 12; Tr I.27:3-6, I.29:6-8.[1]  The prior servicer was Aurora Bank, FSB, whose servicing portfolio and assets were acquired by Nationstar the previous month.  Trial Ex. 25; Tr I.29:11-30:3.  Aurora Loan Services, LLC ("Aurora"), serviced the Baroni loan before Aurora Bank, FSB.  Trial Ex. 13; Tr I.45:17-23.

Normally, when Nationstar services a loan, the original note, deed of trust, and other documents are held in a "collateral file" by a document custodian.  Tr I.48:10-13.  The collateral file typically contains the original promissory note, mortgage or deed of trust, and title insurance policy.  Tr.I 56:1-5.  The collateral file may contain other documents relevant to the loan, such as recorded assignments or a loan modification agreement.  Tr. I.56:6-7.

Nationstar will obtain the loan's "collateral file" from the custodian in certain situations, such when it initiates foreclosure proceedings, when it needs to respond to a qualified written request under RESPA, or when a borrower contests a bankruptcy claim.  Tr I.48:18-49:1.  In the case of contested bankruptcy claim where the validity of the original note is at question, Nationstar's practice would be to then forward the collateral file to its bankruptcy counsel.   Tr I.49:2-7.

And so it happened here.  Due to the litigation by Ms. Baroni, the collateral file for the Baroni loan was obtained by Nationstar and sent to its attorney of record, Adam Barasch, on or about April 25, 2013.  Trial Ex. 36; Tr I.49:8-50:2.  Summary judgment was granted in favor of Nationstar on December 5, 2014.  ECF No. 74.  Mr. Barasch would then return the file to Nationstar, who would then return it to U.S. Bank as custodian of record.  TR I.53:16-24.

---

[1] Three trial transcripts, one for each day, are on file with the Court as ECF 400 for the October 22 trial date, ECF 401 for the October 23 trial date, and ECF 402 for the October 24 Trial date.  For purposes of brevity, Nationstar will refer to October 22 Transcript as Volume I, the October 23 Transcript as Volume II, and the October Transcript of Volume III.  Thus the citation to Tr I.27:3-6 refers to Volume I, page 27, lines three through six.  Should the Court require physical chambers copies of the trial transcripts, Nationstar will provide them.

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

1    Ms. Baroni would appeal the summary judgment order, and on November 10, 2015, and

2  would win reversal of the judgment as to three of her causes of action.  ECF No. 127.  As the

3  litigation would continue, Nationstar again took possession of the collateral file.  Tr.I:53:25-54:3,

4  II.92:3-23.  Nationstar would then route the collateral file back to Mr. Barasch on or about

5  December 8, 2016.  Trial Ex. 37; Tr. I.54:4-23.  Mr. Barasch held the collateral file at his firm until

6  the date of trial, whereupon portions of the collateral file were taken into possession by the Court

7  as exhibits 1A, 1B, and 1C.

8    The collateral file contains the original Note.  Trial Ex. 3, 1A; Tr. I.55:19-57:11.  The Note

9  bears three indorsements on the reverse of the signature page bearing Mr. Baroni's wet-ink

10  signature.  One is from the payee of the Note, Platinum Captial, to Lehman Brothers Bank FSB

11  ("Lehman Bank").  A second is from Lehman Bank to Lehman Brothers Holdings, Inc. ("Lehman

12  Holdings").  A third is from Lehman Holdings to blank.  Trial Ex. 1a; Tr. I.61:15-19.  The

13  collateral file also contains the original Deed of Trust bearing Mr. Baroni's wet-ink signature, a

14  title insurance policy, and a copy of the Note which contains a slightly different configuration on

15  the indorsement page.  Trial Exs. 1a, 2a, 3, 3a.

16  **C.    The Assignment of Title to the Baroni Loan**

17    **1.    The Initial Sale of the Note to the SARM 2004-5 Trust**

18    The Note was made payable to Platinum Capital.  Trial Ex. 1a.  A funding "Delivery

19  Commitment Confirmation" and related documents that appear in the Baroni loan origination file

20  indicate that Platinum Capital delivered the Baroni loan to Lehman Bank, after it was originated.

21  Trial Ex. 32; Tr. I.84:1-85:22.  Lehman Bank then assigned its ownership interest in a pool of

22  loans to Lehman Holdings.  Trial Ex. 27; Tr. 1.82:12-83:6.  Lehman Holdings then assigned the

23  loans to Structured Asset Securities Corporation.  Trial Ex. 28; Tr. I.81:5-82:11.  The final step

24  was a Trust Agreement pursuant to which Structured Asset Securities Corporation, as depositor,

25  transferred its ownership interest in the Note to Wells Fargo in its capacity as trustee of the

26  SARMS 2004-5 trust (the "SARMS 2004-5 trust").  Trial Ex. 31; Tr. I.74:11-13-76:10.  Notably,

27  this chain of ownership is consistent with the Note indorsements from Platinum Capital to Lehman

28  Bank to Lehman Holdings.

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

1    Aurora Loan Services Inc. was designated as the "master servicer" of the loans in the trust.

2    Trial Exs. 30-31; Tr I.75:17-20.  On July 11, 2012, servicing was transferred to Nationstar.  Trial

3    Ex. 11.  Nationstar, as successor to Aurora, held a Limited Power of Attorney to execute

4    documents in the prosecution of bankruptcy proceedings.  Trial Ex. 26; Tr. I.79:11-80:10.

5    The original custodian of record of the collateral file was LaSalle Bank National

6    Association.  Trial Ex. 44; Tr. II.82:15-18.  LaSalle was acquired by Bank of America, N.A.  Tr.

7    II.82:20-23.  U.S. Bank National Association ("U.S. Bank") then acquired Bank of America

8    N.A.'s trust operation, and with it, custody of the Baroni collateral file.  Tr. II.82:23-83:12.  U.S.

9    Bank's records show it acted as custodian of the Baroni loan.  Tr. II.81:10-15.  These records

10    further show that Nationstar was identified as the servicer of the Baroni loan and that the SARMS

11    2004-5 was the trustee of the Baroni Loan.  Trial Ex. 39; Tr. II.84:22-24, Tr. II.90:12-17..

12    **2.**    **The Post-Remand Sale of the Note to the NRZ Pass-Through Trust X**

13    Wells Fargo as Trustee of the SARMS 2004-5 trust owned the Baroni loan until July of

14    2017.  At that time, New Residential Investment Corporation ("NRZ") exercised its right under a

15    prior agreement with Nationstar to direct Nationstar to terminate the SARMS 2004-5 trust.  Tr.

16    II.56:17-23.  This right to terminate the trust accrued when the aggregate balance of the loans held

17    by SARMS 2004-5 trust fell below 10% of the original principal balance.  See Trial Ex. 31 at

18    § 7.01(b); Tr. I.89:9-15, II.54:17-24, II.56:12-16.  On June 15, 2017, Nationstar issued a Notice of

19    Termination of Trust Fund informing Wells Fargo that it would exercise its right to terminate the

20    SARMS 2004-5 Trust in July of 2017.  Trial Ex. 43; Tr. I:89:9-25.

21    Ownership of the Baroni loan was initially assigned by SARMS 2004-5 Trust to NRZ

22    Sponsor VII LLC (NPL).  Trial Exs. 19-20; Tr. I.90:11-92:4; Tr. II.59:17-62:16.  NRZ Sponsor

23    VII LLC (NPL) assigned the Baroni loan to NRZ Mortgage Holdings LLC.  Trial Ex. 8; Tr.

24    I.92:17-93:16, Tr. II.62:17-63:18.  NRZ Mortgage Holdings LLC then assigned the loan to U.S.

25    Bank National Association, not in its individual capacity but solely as Trustee of NRZ Pass-

26    Through Trust VII (NPL).  Trial Ex. 7; Tr. I.93:20-94:10, Tr. II.63:19-64:12.

27    NRZ partially financed the purchase of the loans assigned to the NRZ Pass-Through Trust

28    VII, including the Baroni loan, through J.P. Morgan Chase Bank, N.A. ("J.P. Morgan").  Tr.

1   II.60:6-14.  J.P Morgan was thus identified as the Repo Buyer in the various sale and assignment

2   documents.  See, *e.g.,* Trial Exs. 19-20.

3           Subsequently, NRZ refinanced certain loans held by the NRZ Pass-Through Trust VII,

4   including the Baroni loan, with Forethought Life Insurance Company ("Forethought").  Tr.

5   II.64:20-23.  NRZ created a new pass-through trust entity, NRZ-Pass Through Trust X, in order to

6   hold loans financed by Forethought.  Tr. II.64:23-65:2.  Under the structure of the new trust, all

7   payments made on the loans held by the trust would flow to Forethought to cover the monthly

8   principal and interest payments, with any excess payments then flowing to NRZ once the loan was

9   paid.  Tr. II,66:1-8.  In order to secure these payments, Forethought was named the sole

10  certificateholder of the NRZ-Pass Through Trust X, and as sole certificateholder received a

11  security interest in the assets of the trust itself.  Tr. II.66:7-67:15; see also Exhibit A-2 to Trial Ex.

12  15.  As certificateholder, Forethought is considered the nominal "owner" of the trust until the

13  financing is repaid.  Tr. II.67:5-19; see also Trial Ex. 15 at § 3.06.

14          To effect this refinance and transfer, U.S. Bank National Association, not in its individual

15  capacity but solely as Trustee of NRZ Pass-Through Trust VII (NPL), assigned the loan to NRZ

16  Mortgage Holdings LLC.  Trial Ex. 6; Tr. I:8-96:4, Tr. II:65:5-8.  NRZ Mortgage Holdings LLC

17  then assigned the loan to U.S. Bank National Association, not in its individual capacity but solely

18  as Trustee of NRZ Pass-Through Trust X – its current owner.  Trial Exs. 5, 15; I.96:5-18, Tr.

19  II:65:5-9.[2]  NRZ-Pass Through Trust X remains the investor of the Baroni loan.  Trial Ex. 45; Tr.

20  I.86:5-8, Tr. II.67:21-25.  During all these transfers, Nationstar remained servicer of the loan.

21  Trial Ex. 18; Tr. I.97:11-98:18, Tr. II.68:9-14.

22

23  _____

24  [2] The assignments reflected by in trial exhibits five and six were actually executed in August of
    2018 – after the actual transfer of the loan to NRX Pass-Through Trust X in October of 2018.

25  There is nothing ominous or improper about this late documentation.  The actual parties to the
    assignment considered the trust agreement for NRX Pass-Through Trust X sufficient to document

26  the assignment.  See Trial Ex. 15.  Nationstar requested the later preparation of the assignments as

27  it "believe[d] that because of the litigation it was necessary to provide additional documentation to
    reflect the trail to the current owner of the Baroni loan."  Tr. I.97:8-10.

28

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

1    U.S. Bank issued a Limited Power of Attorney to Nationstar allowing it to demand,

2  recover, collect and receive funds belonging to U.S. Bank and sign documents to facilitate

3  servicing of the loans contained in the NRZ Pass-Through Trust X.  Trial Ex. 9; Tr. I:20-99:8.

4    Finally, a custodial agreement was entered into naming Wells Fargo Bank, N.A. as the

5  custodian of the NRZ Pass-Through Trust X.  Trial Ex. 15; Tr. II.68:18-69:3.  However, because

6  the collateral file remained with Adam Barasch, and is now held with the Court, Wells Fargo has

7  not taken possession of the collateral file for the Baroni loan.

8                        **III.  PROCEDURAL HISTORY**

9    Nationstar filed Claim 9-1 on September 17, 2012.  Trial Ex. 4.  On April 3, 2013, Ms.

10  Baroni filed the present adversary proceeding against Nationstar challenging the claim.  In her

11  First Amended Complaint, she alleges that she "does not dispute that she owes money on her

12  mortgage obligation."  Rather, she "seeks the Court's assistance in determining who the true

13  creditor is of the Note and Deed of Trust."  ECF No. 10 at ¶ 13.  The First Amended Complaint

14  alleges causes of action (1) to determine the nature, extent, and validity of lien, (2) quasi-

15  contract/unjust enrichment, (3) violation of the Fair Debt Collection Practices Act (FDCPA), 15

16  U.S.C. § 1692 et seq., and (4) violation of California Business & Professions Code section 17200.

17    Nationstar answered (ECF No. 31), and then filed a motion for summary judgment (ECF

18  No. 50).  This Court granted the motion.  ECF No. 74.  Ms. Baroni appealed.  ECF No. 76.

19    The BAP focused on the fact that the copy of the Note that Nationstar filed in support of

20  Claim 9-1 displayed a different configuration of indorsements that the copy of the Note that

21  Nationstar filed in support of its motion for summary judgment:

22           Our resolution of this appeal largely hinges on our answer to a single
             question: when a creditor, in the process supporting a proof of claim based
23           on a promissory note, presents the bankruptcy court with two materially
             different copies of the indorsements supposedly accompanying the note,
24           can the court on summary judgment correctly determine that there is no
             genuine dispute that the note has been duly indorsed in blank?  We answer
25           this question in the negative.

26  *In re Baroni,*  2015 WL 6956664, at *1 (B.A.P. 9th Cir. Nov. 10, 2015).  The BAP issued a

27  memorandum opinion affirming dismissal of the FDCPA cause of action but otherwise reversing

28  and remanding for further proceedings.  *Id.*

As this Court subsequently explained in an order (ECF No. 216), the BAP specifically contrasted this indorsement issue with several other issues that it considered and rejected as a basis for reversal and remand: (i) the authenticity of James Baroni's signature on the Note and (ii) the possibility that there were two or more promissory notes in existence.  First, the BAP held that "[s]ignatures on negotiable instruments are presumed to be authentic and authorized, and [Baroni had] not presented any evidence to overcome that presumption [in the case of the Carmel note]." *Baroni*, 2015 WL 6956664 at *28.  Second, the BAP held that the "summary judgment record indicates that there is only one original Carmel note and that Nationstar's attorney Adam Barasch is in possession of it." *Id*. at *27.  Further, the BAP agreed with a declaration submitted by Meredith DeKalb Miller, an expert witness for Ms. Baroni, which observed that "all of the note copies are representative copies of the same note and that James' signature on each of the note copies is consistent." *Id*.

Following remand, this Court entered an Order Re: Scope of Issues on Remand delineating the issues to be tried as follows:

> 1.  The First Cause of Action for Declaratory Relief on the following issues only:
>
>     a.    Whether the "original Carmel note" (as defined by the Panel in its Memorandum) was duly endorsed in blank and made payable to the bearer and, therefore, whether Nationstar qualifies as a holder of the note and a person entitled to enforce the note.
>
>     b.    Whether Wells Fargo, as trustee of a securitization trust, owns the "Carmel note" and therefore qualifies as a nonholder in possession of the note with rights of a holder under UCC § 3-301 and the related issue of whether Nationstar is Wells Fargo's agent with respect to the "Carmel Note;"
>
> 2.  The Second Cause of Action for Quasi Contract / Unjust Enrichment which this Court will treat as a quasi-contract claim seeking restitution; and
>
> 3.  The Fourth Cause of Action for Violations of California Business & Professions Code § 17200 *et seq*.

ECF No. 149 at 2:11-18.

Trial was held between October 22 and October 24.  At the conclusion of trial, the Court ordered post-trial briefs be filed by the parties.

## IV.  NATIONSTAR MAY ENFORCE THE NOTE

**A.      Standing to Enforce a Secured Promissory Note**

Generally, a person is entitled to file a proof of claim based on a secured promissory note if that person is a "person entitled to enforce" the note under California Commercial Code section 3301.  *In re Veal*, 450 B.R. 897, 902 (9th Cir. BAP 2011); *In re Allen*, 472 B.R. 559, 565 (9th Cir. BAP 2012).  At least two ways exist in which a person can acquire "person entitled to enforce" status.  First, to enforce a note under the method most commonly employed, the person must be the "holder" of the note.  Cal. Comm. Code § 3301(i).  Second, a person may enforce the note if it becomes a "nonholder in possession of the [note] who has the rights of a holder."  Cal. Comm. Code § 3301(ii).  Nationstar showed at trial that it qualifies a "person entitled to enforce" under both standards.

**B.      Nationstar Is the "Holder" of the Note**

A person is a "holder" of a note if the person possesses the note and either (i) the note has been made payable to the person who has it in his possession, or (ii) the note is payable to the bearer of the note.[3]  Cal. Comm. Code § 1201(b)(21)(A).  "The obligation evidenced by an instrument payable to bearer runs to the person possessing the instrument.  Thus, any person in possession of a payable to bearer instrument is its holder including thieves or finders."  5 Hawkland, Miller & Harrell, *Uniform Commercial Code Series*, § 3-301:1, p. 370 (2018).  "This determination requires physical examination not only of the face of the note but also of any indorsements."  *Veal*, 450 B.R. at 911.

**1.      Nationstar Is the Bearer of an Indorsed Note**

Very little is needed to indorse a note.  "'Indorsement' means a signature . . . that alone or accompanied by other words is made on an instrument for the purpose of (1) negotiating the instrument."  Cal. Com. Code § 3204(a) (emphasis added).  "[R]egardless of the intent of the

---

[3] "'Bearer' means a person in possession of a negotiable instrument, document of title, or certificated security that is payable to bearer or endorsed in blank."  Cal. Comm. Code § 1201(b)(5).

1  signer, **a signature and its accompanying words is an indorsement** unless the accompanying

2  words, terms of the instrument, place of the signature, or other circumstances unambiguously

3  indicate that the signature was made for a purpose other than indorsement." Thus, "[t]he general

4  rule is that a signature is an indorsement if the instrument does not indicate an unambiguous intent

5  of the signer not to sign as an indorser." Cal. Com. Code § 3204, cmt. 1. Finally, the Commercial

6  Code states that a signature "is presumed to be authentic and authorized." Cal. Comm. Code §

7  3308(a). Accordingly, for Nationstar to meet its burden, it needed only show that (i) there is a

8  signature; (ii) the signature is physically on the note; and (iii) the signature does not

9  unambiguously indicate it was made for a purpose other than indorsement.

10      Nationstar made this showing. At trial, the collateral file was provided to Nationstar's

11  witness, Edward Hyne. Mr. Hyne is employed by Nationstar as a Senior Assistant Secretary of

12  Litigation Support and Resolution Analyst. Tr.25:12-13. Mr. Hyne reviewed the collateral file

13  and confirmed that it was marked as the collateral file for the Baroni loan. Tr. I.55:19-57:11. Mr.

14  Hyne further confirmed that the collateral file contained the original Note. Tr. I.57:9-14. The

15  original Note was then taken by the Court and marked as Exhibit 1a. Tr. I.59:12-24.

16      Mr. Hyne then reviewed the original Note itself and confirmed it contained the original

17  loan number assigned to Loan by Aurora. Tr. I.60:1-9. It also contained the original signature of

18  James J. Baroni. Tr. I.60:14-16.

19      Mr. Hyne then reviewed the back of the page containing James Baroni's signature on the

20  Note. He confirmed that three indorsements were contained on this page. The first from Platinum

21  Capital to Lehman Bank, the second from Lehman Bank to Lehman Holdings, and the third from

22  Lehman Holdings to a blank indorsement. Tr. I.61:15-19. Mr. Hyne further confirmed that the

23  indorsements were "wet-ink," *i.e.* were the original indorsements. Tr. I.62:8-11. Finally, Mr.

24  Hyne confirmed that he had reviewed "dozens" of original promissory notes from other loans

25  where Nationstar had taken over the servicing rights from Aurora, that he had seen this exact

26  configuration of indorsements "quite frequently," and there was nothing unusual about this

27  indorsement page. Tr. I.61:20-62:7.

28

1    As the Court can itself determine from its inspection of the Note, the indorsements are

2  valid.[4]  The indorsements are clearly "wet-ink" originals.  The indorsements are on the reverse of

3  the page bearing Mr. Baroni's signature.  There are no indicia of fraud or tampering.  Nothing in

4  the signatures disclaim that they are an indorsement – in fact, the signatures expressly state their

5  purpose is to "pay to the order of."   Therefore, based on the Note alone, the Court may conclude

6  that the Note is indorsed in blank and thus Nationstar is its "holder" and a "person entitled to

7  enforce" the Note.  Cal. Comm. Code §3301(i).

8    **2.    Baroni Has Not Rebutted the Validity of the Signatures**

9    The collateral file also contains a photocopy of the Note with the handwritten notation

10  "Copy" on the first page (the "Photocopied Note").  The Photocopied Note has been introduced

11  into evidence as Trial Exhibit 3a.  The Photocopied Note omits the indorsements appearing on the

12  reverse of the signature page on the original Note.  Instead, the Photocopied Note includes an

13  additional page with the same three indorsements, but the two Lehman indorsements are

14  configured differently than on the original Note.  See Trial Ex. 3a.  Ms. Baroni asserts that the

15  existence of the Photocopied Note, by itself, rebuts the presumption of validity of the signatures.

16    Ms. Baroni's challenge first fails as her complaint does not expressly deny the validity of

17  any of the signatures on the indorsements in her pleadings.  The Commercial Code specifically

18  discusses the procedure for challenging the authenticity of a signature and the presumptions when

19  a signature is successfully challenged.  "In an action with respect to an instrument, the authenticity

20  of, and authority to make, each signature on **the instrument is admitted unless specifically**

21  **denied in the pleadings**."  Cal. Comm. Code § 3308(a) (emphasis added).   While the complaint

22  alleges that the signatures are "undated," "unauthenticated," and "stamped," there is nothing

23  improper about this.

24

25

---

26  [4] In fact, this Court was mandated to do so by the BAP.  "[W]hen as here the debtor legitimately
27  contests the validity of the indorsements, the bankruptcy court is obliged to physically inspect
   them."  *Baroni*, 2015 WL 6956664, at *9.

28

1    An unauthenticated, undated, stamped signature is a signature under the Commercial Code.

2    "As the term 'signed' is used in the Uniform Commercial Code, a complete signature is not

3    necessary. The symbol may be printed, stamped or written; it may be by initials or by thumbprint."

4    Cal. Com. Code § 1201 cmt. 37; *see also In re Bass*, 366 N.C. 464, 469 (2013) ("With no

5    unambiguous evidence indicating the signature was made for any other purpose, the stamp was an

6    indorsement that transferred the Note from Mortgage Lenders to Emax").  Nothing in the

7    complaint alleges that the signatures are forged or unauthorized.  ECF No. 10 at ¶ 15.

8    Accordingly, the validity of the signatures was admitted.  In light of the fact that the Court can now

9    review the original Note and see that the indorsements were placed on the Note, rather than as an

10    unattached signature page, no further inquiry is needed.

11    Even if Ms. Baroni had specifically denied the validity of the signatures in her pleading,

12    that does not mean that Nationstar was required to prove the signatures were not unauthorized or

13    forgeries.  "If the validity of a signature is denied in the pleadings, the burden of establishing

14    validity is on the person claiming validity, **but the signature is presumed to be authentic and**

15    **authorized.**"  Cal. Com. Code § 3308(a) (emphasis added).[5]  The Commercial Code states that

16    when a fact is presumed, "the trier of fact must find the existence of the fact unless and until

17    evidence is introduced that supports a finding of its nonexistence."  Cal. Comm. Code § 1206.

18    "The presumption rests upon the fact that in ordinary experience forged or unauthorized signatures

19    are very uncommon, and normally any evidence is within the control of, or more accessible to, the

20    [party challenging the signature]."  Cal. Com. Code § 3308 cmt. 1.

21    To defeat this presumption, the party challenging the signature must introduce

22    contravening evidence that "need not be sufficient to require a directed verdict, but it must be

23    enough to support the denial by permitting a finding in the defendant's favor."  Cal. Com. Code §

24    3308 cmt. 1.  This burden is relatively high and requires more than a showing of a simple

25    inconsistency that can be explained by mistake or error.  *See In re Phillips*, 491 B.R. 255, 274 n. 4

---

26

27    [5] This applies to the signature of the obligor as well as to the signatures of any indorsers.
5 Hawkland, Uniform Commercial Code, § 3-308:2, pp. 550-551.

28

1  (Bankr. D. Nev. 2013) ("it is more likely that Seterus negligently failed to copy the Note and First

2  Allonge when it filed its Proof of Claim rather than that it forged the First Allonge later on. In

3  short, when both are equally likely, the court picks sloth over venality").  Nor does a general claim

4  that the authority of the indorser was not proven defeat the presumption that the indorser lacked

5  authority to so indorse.  *See Valley Bank of Nevada v. JER Mgmt. Corp.*, 149 Ariz. 415, 419 (Ct.

6  App. 1986) ("Since there was no evidence concerning who actually stamped those indorsements,

7  there was no evidence on which a finding of lack of authorization could have been based"); *see*

8  *also Bass*, 366 N.C. at 471.  Instead, Ms. Baroni was required to introduce "evidence that would

9  tend to show that it was forged or fraudulent."  *In re Stanley*, 514 B.R. 27, 40 (Bankr. D. Nev.

10  2012).

11      The BAP explained the scope of this presumption in its opinion remanding this case.  First,

12  the BAP ruled that "the summary judgment record indicates that there is only one original Carmel

13  note and that Nationstar's attorney Adam Barasch is in possession of it."  *Baroni*, 2015 WL

14  6956664, at *9.  However, that BAP reversed based on its conclusion that "a genuine issue of

15  material fact by presenting with its proof of claim a copy of the note containing a materially

16  different indorsements page than that contained in the Hyne declaration note copy."  *Baroni*, 2015

17  WL 6956664, at *9.

18      This genuine issue of material fact arose because Nationstar, "did not specify whether the

19  indorsements appear on the back of the note's signature page or whether they appear on a separate

20  piece of paper attached to the note, which would make the page containing the indorsements an

21  allonge."  *Baroni*, 2015 WL 6956664, at *9.  The BAP thus found that "a reasonable trier of fact

22  also might infer from the divergent indorsements pages that the original Carmel note never was

23  properly indorsed; rather, an indorsements page might have been placed with the original note by

24  some unknown third party without authority to indorse the Carmel note."  *Baroni*, 2015 WL

25  6956664, at *9.

26      The appeal was of summary judgment, and all that "is required to defeat summary

27  judgment is simply evidence such that a reasonable juror drawing all inferences in favor of the

28  respondent could return a verdict in the respondent's favor."  *Zetwick v. Cty. of Yolo*, 850 F.3d

1  436, 441 (9th Cir. 2017) (internal quotations omitted).  This is not summary judgment and Baroni

2  is no longer entitled to any inferences.  Thus, in order to controvert this presumption, Ms. Baroni

3  was required to provide **some evidence** that the signatures were added at a later time by parties

4  unauthorized to do so.  She failed to do so.

5      As follows, Nationstar clearly showed that that Note was indorsed near the time of

6  origination when it was securitized and that the existence of the Photocopied Note provides, at

7  most, evidence of an accidental indorsement of a copy of the Note during the that sale process.

8  This showing erases any doubt that Ms. Baroni's assertions have any validity.

9      **3.    The Note Was Properly Indorsed During Securitization**

10     As set forth above, at trial Nationstar presented the original, wet-ink Note with original,

11  wet-ink indorsements.  Tr. I.62:8-11.  The BAP already concluded that this Note was the original

12  signed by James Baroni  *Baroni*, 2015 WL 6956664, at *9.  Accordingly, there is no longer any

13  question that the Note itself was physically indorsed.  Any argument that a copy of a signature

14  page was added to the Note by an unauthorized party at a later time is now dead.

15     Further, Nationstar proved at trial that the Note was indorsed at the time it was sold to the

16  SARMS 2004-5 trust, rather than at an unknown later date.  This evidence was provided via the

17  testimony of Mr. John Richards on behalf of U.S. Bank.  U.S. Bank, and its predecessors in

18  interest, was the custodian of the Note until the collapse of the SARMS 2004-5 trust.  Tr. II.82:23-

19  83:12.

20     U.S. Bank employs a system entitled emBTRUST to track notes for which it acts as

21  custodian.

22          It's a system that's been in use for many years. It's a fairly
          standardized system that allows the DCS Group to track the full life

23          cycle of a collateral file from the time it arrives and then any updates
          or location changes that might occur or any releases to external

24          parties, as well as if we become a successor custodian or if we
          receive a collateral file back from someone after a release.

25

26  Tr. II.80:9-16.  The EmBTRUST system does more than track the location of the collateral files.

27  The system will also "note any what I'll call touch or significant event to the collateral file."  Tr.

28  II.87:18-19.

1    One such significant event is the "certification" of a collateral file.  "Certification" is a

2    reference to an actual physical review of the file by a person in order to perform a certification that

3    might be required under the custodial agreement."  Tr. II:88:9-11.  What is required for

4    "certification" depends on the requirements of the underlying custodial agreement.  Tr. II.88:12-

5    19.  In this case, the custodian was to review the collateral file upon delivery to ensure that it

6    included "with respect to each Mortgage Loan, the original Mortgage Note endorsed without

7    recourse in proper form to the order of the Trustee, or in blank (in each case, with all necessary

8    intervening endorsements as applicable)."  Trial Ex. 44 at § 2(a), 3(b); Tr. II.89:24-90:2.

9    Certifications are performed both when directed to by the custodial agreement and at other

10    times as part of the quality control process of U.S. Bank.  Tr. II.88:15-19.  The records of U.S.

11    Bank show that the collateral file was certified on numerous occasions, including on April 29,

12    2004 and on January 1, 2005.  Trial Ex. 40; Tr. II.90:7-11.  The records further show that there

13    was no "exception" to the certification, meaning that "the file contained the documents in the

14    format that was contemplated by the custodial agreement."  Tr. II.107:14-16; see also Trial

15    Ex. 42.

16    Further, in order to further track collateral files, U.S. Bank creates a bar code number for

17    each collateral file so that it my physically track the files.  Tr. II.85:4-8.  The Baroni loan was

18    assigned the bar code ID of 5184439.  Trial Ex. 39; Tr. II.85:9-11.  This same bar code ID is

19    contained on a sticker on the front cover of the physical collateral file.  Trial Ex. 3; Tr. II.86:5-14.

20    Therefore, the Note in evidence as Exhibit 1a is the same as that which was certified by U.S. Bank

21    in 2004.

22    The Note is dated February 26, 2004.  The SARMS 2004-5 trust was created on April 1,

23    2004.  See Trial Ex. 31.  Less than a month later, on April 29, 2004, the collateral filed was

24    certified as being received by U.S. Bank as custodian for the SARMS 2004-5 trust and the Note

25    was certified as indorsed in blank with all necessary intervening indorsements.  Trial Ex. 40; Tr.

26    II.90:7-11.  The collateral file that was certified then is the same collateral file that is now in the

27    possession of the Court.  Trial Ex. 3; Tr. II.86:5-14.  Accordingly, the overwhelming weight of

28    evidence shows that the Note was indorsed at or near the time of origination and securitization, not

1  at some point far in the future when Ms. Baroni challenged the right of Nationstar to enforce the

2  Note.

### 4.    The Photocopied Note Is Easily Explained Without Fraud or Forgery

4       The existence of the Photocopied Note with its slightly different configuration of

5  indorsements was explained by Mr. Simon Ward-Brown, a former employee of Aurora.  Tr.

6  II.113:3-6.[6]  This explanation shows that the existence of the Photocopied Note does not provide

7  any basis for the Court to infer fraud or forgery in the indorsement of the wet ink Note.

### (a)    Aurora's Role in the Sale and Securitization of Loans

9       Aurora was in the primary business of the origination and servicing of mortgage loans and

10  did so in abundance when James Baroni took out the Note in 2004.  Tr. II.113:20-114:21.  Aurora

11  had several avenues for the origination of loans.  One such avenue was direct lending, where

12  Aurora would take a loan application, underwrite it, and if approved, the loan would be funded

13  through its affiliate, Lehman Bank.[7]  Tr. II.118:12-15.  Another avenue was through a

14  "correspondence" channel.   In this case, a different mortgage lender would have an agreement

15  with Aurora that, if it followed Aurora's underwriting guidelines, Aurora's lending affiliate,

16  Lehman Bank, would purchase the loan.  Tr.118:16-24.  In either case, Lehman Bank would take

17  initial title to the loan.

18       The loan would then normally be sold on the secondary market.  If the loan was to be

19  securitized, Lehman Holdings, the parent of Aurora and Lehman Bank, would perform the

20  securitization.  Tr. II.113:9-10, II.119:9-16.  Aurora would then be tasked by Lehman Brothers

21  Holdings with "preparing the loan for sale."  Tr. II.120:8-10.  This was true even if cases where

22  Lehman Holdings purchased the loan from a different originator than Aurora.  Tr. II.120:15-23.

23       As part of the process for preparing the loan for sale, Aurora would perform an audit of the

24  note where the terms of the note would be reviewed, verified, and then uploaded into its servicing

---

26  [6] Mr. Ward Brown is currently an employee of Nationstar.  Tr. II.112:3-6.

27  [7] Lehman Brothers Bank, FSB is the predecessor in interest to Aurora Bank, FSB.  Tr. II.117:13-16.

1    system.  Tr. II.121:5-9.  One step of the audit process was that an Aurora employee would make a

2    physical copy of the note before it was indorsed by any Lehman affiliated entities.  Tr. II.121:11-

3    13.  Aurora developed this practice as some Aurora employees would make physical marks on the

4    note as part of the verification process.  Tr. II.121:14-18.  The practice was thus to audit and verify

5    a copy of the note, even in cases where the auditing employee did not make marks, to ensure that

6    no unnecessary marks were made on the original note.  Tr. II.121:19-24, II. 122:7-12.

7    A second part of the process for preparing the loan for sale was to ensure it was properly

8    indorsed.  In cases where the lender was not Aurora or Lehman Bank, the note would be reviewed

9    for the proper indorsement by the original lender and sent back if it was not found.  Tr. II.122:20-

10    25.  Once the proper initial indorsements, if any, were confirmed, the note would then be indorsed

11    in the order provided for by Lehman Holdings.  Tr. II.123:11-22.  At that point, a team dedicated

12    to indorsing the notes for that securitization (which could be in the thousands for any single

13    securitization) would proceed to indorse the notes as instructed.  Tr. II.123:24-124:6.  This

14    indorsement team was comprised of individuals authorized to sign on behalf the respective

15    Lehman entities on whose behalf they were indorsing.  Tr. II.124:7-14.

16                              **(b)    The Note Was Properly indorsed**

17    Mr. Ward Brown reviewed the original Note.  Mr. Ward found the Note itself to be a

18    perfectly standard Aurora processed note.  Tr. II.126:9-128:1.  As to the indorsement order from

19    Platinum Capital to Lehman Bank to Lehman Holdings, he stated that this would be the normal

20    order of indorsement for a note with a third-party lender that was bought by Lehman Bank then

21    assigned to Lehman Holdings for securitization.  Tr. II.129:6-25.

22    Finally, the placement of the indorsements on the back of the signature page would have

23    been decided by where the first indorsement was placed.  Tr. II.130:3-4.  As Platinum Capital

24    placed the first indorsement, Aurora would have placed the remaining indorsements in the same

25    place.  II.130:5-7.  At that point, a copy of the fully indorsed note was scanned into Aurora's

26    records and the collateral file sent to the custodian.  Tr. II.130:25-131:16.

27

28

1

**(c)       The Unindorsed Copy Was Then Accidently indorsed**

2        Mr. Ward Brown then reviewed the Photocopied Note.  He had a simple explanation for

3   why this copy could include a different pattern of indorsements.  "[I]t appears that it was a clerical

4   error on behalf of the Aurora entities that somebody placed two endorsements on some version of

5   [the Photocopied Note] not realizing that it wasn't the wet ink note."  Tr. II.134:19-135:2.  Mr.

6   Ward Brown explained how this could have happened based on his prior explanation of the

7   business practices of Aurora.

8                the endorsement team would receive the file after the file was
             audited by the auditing team and they would make a copy of the
9             note to verify the terms if they were going to, you know, put
             checkmarks on there and they didn't always do that and then they
10            would put that in the original collateral file. This makes sense to me
             because the actual original endorsement was on the back of the
11            signature page so this team that was placing the subsequent
             endorsements on there would be doing hundreds if not thousands of
12            these in a short window of time to deliver them to the purchaser and
             quite easily they could have endorsed the copy of the note, caught it
13            at some point and endorsed the wet ink note as well. But they would
             be in different positions but they're the exact same endorsing
14            parties.

15   Tr. II.136:8-21.

16        Because both the original Note and the Photocopied Note were in the collateral file, they

17   then would both have been uploaded into Aurora's imaging system.  Tr. II.136:22-25.  And once a

18   document is uploaded into Aurora's imaging system, it cannot be deleted.  Tr. II.138:7-9.

19   Therefore, it would have remained in Aurora's records, and then upon the service transfer, in

20   Nationstar's.  Tr. II.139:3-7.  When Proof of Claim 9-1 was being prepared by Nationstar's

21   outside counsel, they accidently pulled a version of the Photocopied Note rather than the original

22   Note for inclusion in the claim.  See Tr. I.48:6-9, II.138:10-139:2.

23        Mr. Ward Brown noted an important fact that confirmed his theory as to the existence of

24   the Photocopied Note.  Mr. Ward Brown reviewed the indorsements on both the wet-ink Note and

25   the Photocopied Note and concluded that "the Platinum Capital Group endorsement remained in

26   the same position on the actual -- as the wet ink promissory note, the difference being is that the

27   subsequent endorsements, the Lehman endorsements were placed in different positions."  Tr.

28   II.135:15-19, II.154:10-14.  A cursory review of the wet-ink Note and the Photocopied Note

1    shows that this is the case.  Compare Trial Ex. 1a to Trial Ex. 1c.[8]

2         The consistent location of the Platinum Capital indorsement confirms that the Photocopied

3    Note is an indorsed version of the audit note.  Because the original lender was Platinum Capital,

4    an unaffiliated entity to Aurora, it would have come to Aurora with the Platinum indorsement

5    already in place.  Tr. II.122:20-25.  The audit copy is made before the indorsement by any Lehman

6    entities.  Tr. II.121:11-13.  Therefore, if the audit copy was accidently indorsed, that copy would

7    necessarily include the Platinum indorsement in the same place, while the Lehman indorsements

8    would vary.  This would not be the case if, for example, an unauthorized party copied the

9    indorsement page of a different Platinum Capital note and attached that copy to the proof of claim.

10   Thus, Mr. Ward Brown concluded that "So 3(a) was a copy and it contained the correct

11   endorsement from the original lender which was Platinum Capital Group and then somebody at

12   one of the Aurora entities inadvertently placed the correct endorsements but in different places

13   than the wet ink note."  Tr. II.143:22-135:2.

14        It should also be noted that the Photocopied Note also has the word "copy" written in the

15   upper-left hand corner.  Trial Ex. 3a.  The wet-ink Note does not.  Trial Ex. 1a.  This supports the

16   theory that the Photocopied Note was the copy created for the purpose of the audit that was

17   accidently indorsed.  Tr. II.143:4-13.

18        Accordingly, the existence of the Photocopied Note does not inherently provide any

19   evidence that the signatures on the indorsements on the wet-ink Note were the product of fraud or

20   forgery.  Instead, the most logical explanation for the existence of the Photocopied Note, and at

21   this point the only explanation, is that the indorsements were made on the audit copy of the Note.

22   As Nationstar is not trying to enforce the Photocopied Note, but the wet-ink Note in the Court's

23   possession as Exhibit 1a, the Photocopied Note's existence has no evidentiary bearing on the

24   validity of the signatures on the wet-ink Note.

25

26   [8] There is some slight difference between the absolute positions of the indorsements, but not the
     relative positions.  As was noted by both Mr. Brown and the Court, that is because the

27   Photocopied Note has been reduced by roughly 25% as part of a copy or scan.  Tr. II:153:18-
     154:23.

28

1   Finally, Mr. Ward Brown explained why this accidental indorsement of a copy was

2   ultimately immaterial to the servicing of the Baroni loan.  "[I]f we ever deem that there was a

3   question to the validity of the actual note in endorsements, we always relied on the actual wet ink

4   note and we would request the collateral file and then we would scan that up as a verified

5   collateral file or verified original note."  Tr. II.135:3-8.  Therefore, the Photocopied Note would

6   never be relied on in case of any serious dispute (such as this one).  As there is only one original,

7   wet ink note in the collateral file, and no other wet ink notes have been produced, the Note

8   attached as Exhibit 1a is only operative note for the Baroni loan.

9   **C.    Nationstar is the "Transferee" of the Note**

10   Even if the Court were to conclude that the indorsement to blank is invalid, Nationstar is

11   still a "person entitled to enforce" the Note because it is a "nonholder in possession of the [note]

12   who has the rights of a holder.  Cal. Comm. Code § 3301(ii).  A person becomes a nonholder in

13   possession when he takes possession pursuant to a "transfer" of the promissory note, as opposed to

14   a "negotiation," as occurs when a note is indorsed and delivered.  *See* Cal. Comm. Code § 3201

15   (definition of negotiation).  A "transfer" of a note "vests in the transferee any right of the

16   transferor to enforce the instrument."  Cal. Comm. Code § 3203(b).

17   Commercial Code section 3203(a) states that a note is transferred "when it is delivered by

18   a person other than its issuer for the purpose of giving to the person receiving delivery the right to

19   enforce the [note]."  Accordingly, "[a] transfer has two requirements: the transferor (any person

20   that transfers the note, except the issuer) must intend to vest in the transferee the right to enforce

21   the instrument (thieves and accidental transferees are excluded) and must deliver the instrument so

22   the transferee receives actual or constructive possession." *Anderson,* 424 Md. at 248; see also

23   *Veal*, 450 B.R. at 912 ("Without holder status and the attendant presumption of a right to enforce,

24   the possessor of the note must demonstrate both the fact of the delivery and the purpose of the

25   delivery of the note to the transferee in order to qualify as the 'person entitled to enforce'").

26   There is no question that Nationstar satisfies the second requirement of possession of the

27   original Note.  That leaves the first – the transferor's intent to vest Nationstar with the right to

28   enforce the Note so that it is the proper person to enforce the Note.

1.      **The Delivery of the Note to Nationstar Was Given With Intent to Enforce it in this Proceeding**

To answer this question, the Court may look at the surrounding circumstances regarding the delivery of the notes to infer the intent of the parties. *Fed. Deposit Ins. Corp. v. Ashmore*, 698 F. App'x 286, 292 (6th Cir. 2017). This is especially true when, as here, the transferors include, "a presently defunct bank . . . because the likelihood of a paper trail relating specifically to the purpose of the parties at the time of the delivery is minimal." *Id.* The Court should infer that delivery was deliberate absent evidence to the contrary. *Anderson,* 424 Md. at 248 ("[n]o entity in the Note's transfer chain is claimed to have acquired possession of the Note by theft or accident"); *Ashmore*, 698 F. App'x at 293 ("this string of emails does not present any fact from which a juror could reasonably infer that the delivery of the Note was for any purpose other than to allow the Bank to execute it"). Thus the only question is whether the delivery of the Note to Nationstar was deliberate, rather than "by theft or accident."[9]  *Anderson,* 424 Md. at 248; see also 5 Hawkland, Uniform Commercial Code, § 3-203:2, p. 296 ("Because of these requirements, neither a thief, a person obtaining possession by mistake, nor a person possessing the instrument in trust for the transferor are transferees").

Nationstar is such a transferee. U.S. Bank, the custodian of record, delivered the collateral file containing the Note to Nationstar on or about November 2, 2016. Trial Exs. 40, 41; Tr. II.92:3-23. Nationstar forwarded the collateral file to its counsel Adam Barasch to facilitate enforcement of its claim in Ms. Baroni's bankruptcy proceeding. Trial Ex. 47; Tr. II.92:5-9.

---

[9] The only circumstance where a party may intentionally deliver a note without providing intent to for the party taking delivery to enforce the note is when the note is transferred for safekeeping. See 5 Hawkland, Uniform Commercial Code, § 3-203:2, p. 296. This is not the normal case, and barring evidence of such intent, this Court should presume that delivery was for the purpose of enforcement. *Ashmore*, 698 F. App'x at 294 ("there is nothing in the record that would allow a jury to draw a reasonable inference that the purpose underlying the delivery was to allow the Bank to hold the Note in trust"). Further, in such cases where the note is delivered for safekeeping, the party for whom the note is held in safekeeping remains the party entitled to enforce the note. *Bank of New York v. Raftogianis*, 418 N.J. Super. 323, 331, 13 A.3d 435, 440 (Ch. Div. 2010) ("A number of cases recognize that there can be constructive delivery or possession, through the delivery of the instrument to an agent of the owner").

1  Thus, Nationstar was delivered the Note to enforce it.  *See J.E. Robert Co. v. Signature Properties,*

2  *LLC*, 309 Conn. 307, 330 (2013) ("these provisions clearly support the trial court's conclusion that

3  it was LaSalle's intention to deliver the note to its special servicer 'for the purpose of giving to the

4  person receiving delivery the right to enforce the instrument'").  Nationstar is therefore a "person

5  entitled to enforce" the Note, even without the indorsement to blank.

6      **2.    The Sale of the Note to the SARMS 2004-5 Trust Is Evidence that the Note
              Was Delivered With Intent to Enforce**

7

8      As was noted by the *Veal* Court, one common instance of an Article 3-203 transfer is "a

9  sale of notes in bulk without individual indorsement of each note—that other person (the

10  transferee) obtains from the holder the right to enforce the note even if no negotiation takes place."

11  *Veal*, 450 B.R. at 911.  When delivery of a note is done in conjunction with a memorialized

12  transaction, that is nearly conclusive evidence of intent to transfer the right to enforce the note.

13  *See Ashmore*, 698 F. App'x at 291 ("the duly executed Assignment provides overwhelming

14  evidence that the delivery of the Note by Citizens to the Bank was for the purpose of giving the

15  Bank the right to enforce the Note").   Nationstar can thus demonstrate the necessary transfer with

16  intent to enforce by providing evidence that it acted as servicer for the purchaser of the Baroni

17  loan when Nationstar took physical possession of the Note.

18      At the summary judgment phase, Nationstar sought to establish that it took possession as

19  agent for the SARMS 2004-5 Trust, the owner of the Note by assignment.  Nationstar asserted that

20  this series of transactions was sufficient evidence that the transfer of the Note to Nationstar was

21  intentional and not "by theft or accident."  The BAP did not disagree with Nationstar's legal

22  reasoning.  The BAP, in fact, concluded that had Nationstar demonstrated that the "note was

23  transferred to the [SARMS 2004-5] securitization trust," Nationstar would have prevailed on its

24  transferee claim. *Baroni,* 2015 WL 6956664, at *11.[10]  However, the BAP found that, due to

25

---

26  [10] As set forth by the BAP, "[n]owhere in the Hyne declaration or in the exhibits attached thereto
    is there any competent evidence demonstrating that ownership of the Carmel note was transferred
27  to the above-referenced securitization trust. In the absence of such evidence, Nationstar did not
    establish, for summary judgment purposes or otherwise, that Wells Fargo owned the Carmel note
28  (footnote continued)

1   evidentiary failures, "Nationstar did not establish, for summary judgment purposes or otherwise,

2   that Wells Fargo owned the Carmel note and that Nationstar was Wells Fargo's agent for purposes

3   of servicing the Carmel note." *Baroni*, 2015 Bankr. LEXIS 3859 at *11. Nationstar rectified any

4   such errors at trial by establishing that, when it took possession of the Note, it did so as servicer

5   for the then owner of the Note, the SARMS 2004-5 trust.

6       The Note was originated by Platinum Capital. Trial Ex. 1a. A funding "Delivery

7   Commitment Confirmation" appears in the Baroni loan origination file. Trial Ex. 32. The

8   Delivery Commitment Confirmation is "an agreement between the originator which is Platinum

9   Capital and the other entities, Aurora Loan Services and Lehman Brothers Bank" to "to deliver the

10  closed origination file to you within this time frame and then Lehman Brothers Bank agrees to

11  purchase it if it is delivered within that time frame." Tr. II.147:2-12, I.84:1-85:22. A

12  confirmation was also included in with the Delivery Commitment Confirmation showing that the

13  sale from Platinum Capital to Lehman Bank was consummated. Tr. II.148:2-7; Trial Ex. 32.[11]

14  Therefore, the Baroni loan, including the Note, was first sold to Lehman Bank.

15      Nationstar is then able to trace the assignment of the Baroni loan from Lehman Bank to the

16  SARMS 2004-5 trust through the various assignment agreements it possesses. Nationstar operates

17  a document management system, which Nationstar refers to as Sharepoint, which contains

18  electronic files categorized by each individual trust Nationstar services. Tr. I.73:12-24, I.77:19-

19  78:9. The Sharepoint file for each trust contains "trust agreement, the pooling and servicing

20  agreement, a mortgage loan, schedule and any assignments that there might be regarding the

21  trust." Tr. I:74:4-7.

22      A Sharepoint file exists for the SARMS 2004-5 trust. Tr. I.74:8-10. Nationstar received

23  the documents in this file from Aurora, the prior servicer of the Baroni loan. Tr. I.73:22-73:1.

24  Aurora was the entity that was responsible for preparing the Baroni loan for sale on the secondary

25  
and that Nationstar was Wells Fargo's agent for purposes of servicing the Carmel note." *Baroni*,
26  2015 WL 6956664, at *11.

27  [11] Even Baroni's expert witness conceded that this document is "some evidence that there is a sale
of the loan from Platinum Capital Group to Lehman Brothers Bank, FSB." Tr. III.84:13-15.

28

1    market.  Tr. II.120:8-10.  Therefore any documents contained within the Sharepoint file for the

2    SARMS 2004-5 trust are the securitization documents for that particular trust.  Tr. I.77:22-78:10.

3         Nationstar introduced into evidence the following documents and related testimony

4    demonstrating the assignment of the Baroni loan from Lehman Bank to the SARMS 2004-5 trust.

5    •    An Assignment and Assumption Agreement where Lehman Bank assigned its

6         ownership interest in a pool of loans to Lehman Holdings.  Trial Ex. 27; Tr.

7         1.82:12-83:6.

8    •    A Mortgage Loan Sale and Assignment Agreement where Lehman Holdings

9         assigned the loans to Structured Asset Securities Corporation.  Trial Ex. 28; Tr.

10        I.81:5-82:11.

11   •    A Trust Agreement where Structured Asset Securities Corporation, as depositor,

12        transferred its ownership interest in loans identified in a Mortgage Loan Schedule

13        ("MLS") to Wells Fargo in its capacity as trustee of the SARMS 2004-5 trust.

14        Trial Ex. 31; Tr. I.74:11-13-76:10.

15   •    A MLS which identifies the Baroni loan by the Aurora loan number and matches

16        other characteristics of the Baroni loan.  Trial Ex. 29; Tr. I.:76:11-77:14.

17        Accordingly, Nationstar has in its possession a series of interlocking agreements, all

18   contained in a single electronic file designated for one particular trust, which shows a series of

19   assignments from Lehman Bank to the SARMS 2004-5 trust.  Finally, Nationstar has a MLS that

20   is specifically linked to the SARMS 2004-5 trust which specifically identifies the Baroni loan as

21   one of the loans sold to the SARMS 2004-5 trust under these agreements.  This is more than

22   sufficient evidence that the Baroni loan was in fact sold to the SARMS 2004-5 trust.

23        Nationstar has additional corroborating evidence that the SARMS 2004-5 trust owned the

24   Baroni Note.  Nationstar's servicing system contains a three digit code for each loan it services

25   which identifies the investor on whose behalf the loan is serviced.  Tr. I.71:17-72:9.  In 2014, this

26

27

28

1   code identified the SARMS 2004-5 trust as the investor.  Tr. I.72:10-17.[12]  This code came from

2   Aurora, the prior servicer and the entity which prepared the Baroni loan for sale on the secondary

3   market.  Tr. I:72:2-5, II.120:8-10.  Accordingly, this designation is independent evidence that the

4   Baroni loan was sold to the SARMS 2004-5 trust.

5          Finally, Nationstar reports on a monthly basis to the investors for each loan it services.  Tr.

6   I.72:24-73:6.  In the event that any discrepancy were to arise in the reporting, such as if Nationstar

7   reported on a loan to an investor that did not own the loan, it would be reported immediately by

8   the investor to Nationstar.  Tr. I.73:7-11, I.100:15-18.  At no time since Nationstar started

9   servicing the Baroni loan in 2011 has any investor claimed that Nationstar was reporting the

10  Baroni loan to the wrong investor or to the wrong entity, claimed that the collateral file was sent to

11  Nationstar in error, or made a claim to the original Note.  Tr. I.100:3-18.  The fact that no other

12  entity has laid a claim to the Baroni loan is further evidence that it the loan was transferred to the

13  SARMS 2004-5 trust.

14         Thus, by the weight of the undisputed evidence, the SARMS 2004-5 trust owned the

15  Baroni loan from the date Baroni filed for bankruptcy until July of 2017.  Nationstar acted as

16  servicer of the Baroni loan for the SARMS 2004-5 trust.  Trial Ex. 12; Tr I.27:3-6, I.29:6-8.

17  Nationstar held a Limited Power of Attorney to execute documents in the prosecution of

18  bankruptcy proceedings.  Trial Ex. 26; Tr. I.79:11-80:10.  Accordingly, when Nationstar took

19  possession of the Baroni loan in 2016, it did so as servicer of the Baroni loan on behalf of the

20  investor of the loan, the SARMS 2004-5 trust.  This is all the evidence that was necessary to the

21  Note was delivered to Nationstar deliberately, with intent to enforce, rather than through theft or

22  mistake.

23         **3.      The Subsequent Sale of the Loan Is Irrelevant as Possession Was Not
                      Transferred**

24

25         The fact that the Baroni loan was again sold in July of 2017, after the remand from the

26  _____

27  [12] The investor would subsequently change to NRZ Pass-Through Trust X upon the 2017
     assignment of the loan.  Tr. I.86:9-87:6.

28

NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF

1  BAP, has no bearing on the resolution of this trial.  The Official Commentary of the U.C.C.

2  explains that the "transferee" entitled to enforce a note is not necessarily the same as its owner:

> Although transfer of an instrument might mean in a particular case that
> title to the instrument passes to the transferee, that result does not follow
> in all cases. The right to enforce an instrument and ownership of the
> instrument are two different concepts. . .  Moreover, a person who has an
> ownership right in an instrument might not be a person entitled to enforce
> the instrument.

7  Official Comment 1 to U.C.C. § 3-203.

8  When the Baroni loan was sold in July of 2017 from the SARMS 2004-5 trust, physical

9  possession of the Note was not transferred.  The Note remained in the hands of Adam Barasch, as

10  agent and bailee for Nationstar.  Trial Ex. 37; Tr. II.92:5-9.  Nothing in the California Commercial

11  Code, or even the BAP's decision,[13] states that a transferee can lose its right to enforce a note

12  solely because ownership of the note was transferred without physical transfer of the Note.

13  "Under this definition of transfer, a transfer does not take place without actual delivery of the

14  instrument into the transferee's physical possession." *In re Dudley*, 502 B.R. 259, 276 (Bankr.

15  W.D. Va. 2013).  As Nationstar, through Adam Barasch, remained in physical possession of the

16  Note, any post-sale assignments of title are irrelevant to the right of Nationstar to enforce the

---

[13] All the BAP had to say on the subject was that "[a]s indicated in *In re Veal*, proving a non-holder claim of this type is harder than proving holder status because the claimant must demonstrate not only possession of the original note but also the transfer of some form of interest in the note—either to the party in possession of the note or to a party on whose behalf the possessor has taken possession of the note." *Baroni*, 2015 WL 6956664, at *10.  Nothing in this one statement considered whether transferee status was lost if, subsequent to such a transfer with intent to enforce, ownership was assigned without a physical transfer of the note.  Nor would the BAP have considered that issue as it was not before it at the time.

It should be further noted that the BAP was not clear what it meant by "the transfer of some form of interest."  In *Veal*, the case the court expressly relied on for this statement of law, the BAP did not impose any express requirement of ownership or title.  The *Veal* case expressly stated that to prove transferee status "the possessor of the note must demonstrate both the fact of the delivery and the purpose of the delivery of the note to the transferee in order to qualify as the 'person entitled to enforce.'"  *Veal*, 450 B.R. at 912.  While the *Veal* court suggested that evidence of a loan being part of a "bulk sale" would be sufficient to meet this standard, it did nothing to suggest that a sale was necessary so long as the requisite intent existed.  *Id*. at 911.

1   Note.[14]

2        Finally, Nationstar need not show that any of the transfers were for value or that the

3   promised consideration was paid.  If Ms. Baroni is alleging there was some type of breach of the

4   contract, she has no standing to assert that. "For a contract to be enforceable by a third party, a

5   contract with another must be made expressly for the benefit of the third person." *Aguilera v.*

6   *Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000).  None of the contracts at issue

7   expressly make Ms. Baroni, or any individual borrower, a beneficiary.

8        Similarly, if Ms. Baroni is asserting that the assignments of the Notes fail for lack of

9   consideration, she also lacks standing to assert such a claim.  "A contract may be rescinded if all

10  the parties thereto consent . . . If the consideration for the obligation of the rescinding party fails,

11  in whole or in part, through the fault of the party as to whom he rescinds." Cal. Civ. Code § 1689

12  (emphasis added); see also *Fugelsang v. Fugelsang*, 131 A.D.2d 810, 811 (1987) ("failure of

13  consideration gives the disappointed party the right to rescind the contract").  No party is seeking

14  to rescind any of the contracts at issue and Ms. Baroni may not do so in their stead.

15       Indeed, the Commercial Code specifically contemplates that a transfer may not be for

16  value: "Unless otherwise agreed, **if an instrument is transferred for value** and the transferee

17  does not become a holder because of lack of indorsement by the transferor, the transferee has a

18  specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of

19  the instrument does not occur until the indorsement is made."  Cal. Comm. Code § 3203(c)

20  (emphasis supplied).

21  _____

22  [14] The UCC sets forth a hypothetical that establishes this point in its commentary to section 3-203.

23          X is the owner and holder of an instrument payable to X. X sells the
            instrument to Y but is unable to deliver immediate possession to Y.

24          Instead, X signs a document conveying all of X's right, title, and
            interest in the instrument to Y. Although the document may be

25          effective to give Y a claim to ownership of the instrument, Y is not a
            person entitled to enforce the instrument until Y obtains possession

26          of the instrument. No transfer of the instrument occurs under Section
            3-203(a) until it is delivered to Y.

27  Official Comment 1 to U.C.C. § 3-203.

28

**4.      Nationstar Proved It Also Serviced the Loan Post-Sale**

Nonetheless, Nationstar did show that it serviced the Baroni loan on behalf of the current owner, U.S. Bank National Association, not in its individual capacity but solely as Trustee of NRZ Pass-Through Trust X by introducing into evidence the following documents and related testimony.

- An Escrow Agreement and a Release and Assignment Agreement which, in conjunction, assigned the Baroni loan from the SARMS 2004-5 Trust to NRZ Sponsor VII LLC (NPL).  Trial Exs. 19-20; Tr. I.90:11-92:4; Tr. II.59:17-62:16.

- An Assignment Agreement which assigned the Baroni loan from NRZ Sponsor VII LLC (NPL) to NRZ Mortgage Holdings LLC.  Trial Ex. 8; Tr. I.92:17-93:16, Tr. II.62:17-63:18.

- An Assignment Agreement which assigned the Baroni loan from NRZ Mortgage Holdings LLC to U.S. Bank National Association, not in its individual capacity but solely as Trustee of NRZ Pass-Through Trust VII (NPL).  Trial Ex. 7; Tr. I.93:20-94:10, Tr. II.63:19-64:12.

- An Assignment Agreement which assigned the Baroni loan from U.S. Bank National Association, not in its individual capacity but solely as Trustee of NRZ Pass-Through Trust VII (NPL), to NRZ Mortgage Holdings LLC.  Trial Ex. 6; Tr. I:8-96:4, Tr. II:65:5-8.

- An Assignment Agreement which assigned the Baroni loan from NRZ Mortgage Holdings LLC loan U.S. Bank National Association, not in its individual capacity but solely as Trustee of NRZ Pass-Through Trust X.

NRZ-Pass Through Trust X remains the investor of the Baroni loan.  Trial Ex. 45; Tr. I.86:5-8, Tr. II.67:21-25.  During all these transfers, Nationstar remained servicer of the loan. Trial Ex. 18; Tr. I.97:11-98:18, Tr. II.68:9-14.  U.S. Bank issued a Limited Power of Attorney to Nationstar allowing it to demand, recover, collect and receive funds belonging to U.S. Bank and sign documents to facilitate servicing of the loans contained in the NRZ Pass-Through Trust X. Trial Ex. 9; Tr. I:20-99:8.

1    Baroni introduced no evidence to controvert this chain of assignments.  Nor could she,

2    given that all parties to the sale, Nationstar, U.S. Bank, and NRZ, sent witnesses to testify as to the

3    validity of the sale.  Accordingly, to the extent it is even relevant, Nationstar proved that it

4    continues to service the Baroni loan on behalf of its current owner.

5    **D.    Baroni's Other Causes of Action Fail**

6    The BAP, along with remanding her cause of action regarding the validity of Claim 9-1,

7    also remanded her second cause of action for  Quasi Contract / Unjust Enrichment and her fourth

8    cause of action for Violation of California Business and Professions Code section 17200.  Unlike

9    her claim objection, Ms. Baroni bears the burden of proof on these causes of action.  *Tourgeman v.*

10    *Nelson & Kennard*, 900 F.3d 1105, 1109 (9th Cir. 2018) ("the burden of [proof] lies where it

11    usually falls, upon the party seeking relief").  She fails to meet this burden.

12    A common element of both Ms. Baroni's unjust enrichment and Business & Professions

13    Code section 17200 claims is that she has paid money to Nationstar that must be returned.  ECF

14    No. 10 at ¶¶ 37, 62.  However, Ms. Baroni offered no evidence that she has paid anything to

15    Nationstar.  Further, she offers no evidence that Nationstar sought to foreclose on the Property.

16    Accordingly, even if she prevails on her claim to extinguish the lien, she is not entitled to

17    restitution.  The two claims must therefore fail.

18    "The theory of unjust enrichment requires one who acquires a benefit which may not justly

19    be retained, to return either the thing or its equivalent to the aggrieved party so as not to be

20    unjustly enriched."  *Prakashpalan v. Engstrom, Lipscomb and Lack*, 223 Cal.App.4th 1105, 1132

21    (2014) *as modified on denial of reh'g* (Feb. 27, 2014) (*quoting Otworth v. Southern Pac.*

22    *Transportation Co.*, 166 Cal.App.3d 452, 460 (1985).  "The elements of an unjust enrichment

23    claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of

24    another."  *Peterson v. Cellco Partnership*, 164 Cal.App.4th 1583, 1593 (2008).

25    An action for unfair trade practices under Business & Professions Code section 17200

26    arises when a business practice offends an established public policy or when the practice is

27    immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  *Wolfe v.*

28    *State Farm Fire & Casualty Ins. Co.*, 46 Cal. App. 4th 554 (1996).  Damages are not an available

1   remedy for violation of Business & Professions Code section 17200.  The sole remedy available is

2   restitution of money or property wrongfully obtained.  *Inline, Inc. v. Apace Moving Systems, Inc.*,

3   125 Cal.App.4th 895 (2005).

4          As noted, Ms. Baroni is not the "borrower" on the loan and is not personally liable for the

5   debt.  She does not intend to introduce any documentary evidence showing that she paid money to

6   Nationstar.  Further, to the extent Ms. Baroni asserts that her state law claims arise out of acts

7   taken in the bankruptcy, such causes of action are prempted by the Bankruptcy Code.  *MSR Expl.,*

8   *Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir. 1996).  Thus, without payment of money or

9   other property, she is not entitled to restitution.  Both claims must fail.

10                                    **V.  CONCLUSION**

11         Nationstar is both the "holder" of the Note and its "transferee."  Either way, it is a "person

12   entitled to enforce" the Note and has standing to file Claim 9-1 in Ms. Baroni's bankruptcy case.

13   Ms. Baroni has not provided any evidence to the contrary.  Her adversary claims should be denied.

14

15   DATED:  December 13, 2018                 SEVERSON & WERSON
                                              A Professional Corporation
16

17

18                                           By:  ___/s/ Bernard J. Kornberg_____
                                                     Bernard J. Kornberg
19
                                             Attorneys for Creditor NATIONSTAR MORTGAGE
20                                           LLC

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is One Embarcadero Center, Suite 2600, San Francisco, CA 94111.

A true and correct copy of the foregoing document entitled (*specify*):  NATIONSTAR MORTGAGE LLC'S POST-TRIAL BRIEF; COPIES OF UNPUBLISHED DECISIONS  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  December 13, 2018  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Richard L Antognini    , rlalawyer@yahoo.com
•Adam N Barasch    anb@severson.com, dgl@severson.com;nye@severson.com
•Eric Bensamochan    eric@eblawfirm.us, G63723@notify.cincompass.com
•Bernard J Kornberg    bjk@severson.com, elw@severson.com
•Michael S Riley    mriley8@aol.com, 10986aa@gmail.com
• United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) December 13, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Judge Martin R. Barasch
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) December 13, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**\*By Email\***
Harry A. Olivar
harryolivar@quinnemanuel.com

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 13, 2018 | Bernard J. Kornberg | /s/ Bernard J. Kornberg |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.